378 So.2d 640 (1979)
Stanley Kelvin COLEMAN
v.
STATE of Mississippi.
No. 51372.
Supreme Court of Mississippi.
December 19, 1979.
*641 Gray, Montague, Jackson, Pittman & Hammond, S. Robert Hammond, Jr., Hattiesburg, for appellant.
A.F. Summer, Atty. Gen. by Marvin L. White, Jr., Sp. Asst. Atty. Gen., Jackson, for appellee.
EN BANC.
ROBERTSON, Presiding Justice, for the Court:
Stanley Kelvin Coleman and James Sims, Jr. were jointly indicted by the grand jury of the Circuit Court of Forrest County for capital murder in the killing of Harry Burkett on October 6, 1977, while engaged in the commission of the crime of burglary or attempted burglary. After a separate trial, Coleman was found guilty of capital murder and after a separate hearing on the sentencing phase the jury unanimously found:
"[T]hat the aggravating circumstance of:
1) The capital murder was committed while the defendant was engaged in commission of burglary and/or attempted burglary
is sufficient to impose the death penalty and that there are insufficient mitigating circumstances to outweigh the aggravating circumstance."
The circumstances of the killing are basically undisputed. The state's case rested primarily on the testimony of James Sims, Jr., defendant's accomplice in the burglary and murder; Mrs. Harry Burkett, wife of the victim; and a written confession obtained from defendant Coleman.
At the conclusion of the state's case, the defendant moved for a directed verdict, and when the motion was overruled defendant rested his case.
*642 On the night of October 5, 1977, the night before the killing, 16-year-old Coleman, armed with a 410 gauge shotgun, and his friend, James Sims, Jr., went to the home of Harry Burkett with the intent to burglarize the home. When they found the Burketts at home, they returned to their own homes. The next night, October 6, 1977, Coleman and Sims returned to the Burkett home about 7:30 p.m. Finding the Burketts away, Coleman, carrying the 410 gauge shotgun, entered the Burkett home by removing a screen and opening a window. Coleman was unable to find a money box in the house, but Sims found what appeared to be a money box on the floor of Burkett's pickup truck parked nearby in the driveway.
Coleman broke a front vent glass window on the truck, but before they could enter the truck, the Burketts drove up. Coleman tried to hide in front of the truck, and Sims crawled underneath it. After parking their car behind the pickup truck, the Burketts went to the front door of their home and Mrs. Burkett went inside. Mr. Burkett walked back to his truck, noticed the broken window and went around the truck to investigate. Apparently seeing Sims's foot protruding from underneath the truck, Burkett started firing with his .38-caliber pistol. Sims crawled out from under the truck on the opposite side and ran into the woods.
After Burkett began shooting, Coleman shot once at him, and when Burkett shot again Coleman fired a second time.
When Mrs. Burkett heard the shots, she rushed out of the house and into the carport. She saw Coleman "down right in front of the right-hand light to the pickup truck in a squatting position" and recognized him, having known him since he was a child. Coleman, about 15 feet from her, aimed the shotgun at her face, and she testified that Coleman had every chance to kill her, but instead "jumped up and ran."
Harry Burkett walked slowly from the pickup truck, saying "they've killed me, sugar." Mrs. Burkett called the police, and when she came back out of the house Burkett had managed to get to the carport where he had fallen down. He kept telling his wife to get his billfold out of his back pocket and after she did this she asked him "how many were there", and he said "two." Mrs. Burkett continued:
"And I said were they black or white? He said black. I said who did it, Harry? And he said Man. And when he said Man, that was his last word  the second time  he repeated it twice. I said are you sure. He said Man and just, his voice just faded away, ..."
"Man" was the nickname by which they knew Coleman.
There are ten assignments of error. These four have to do with the guilt phase of the trial:
I. The trial judge erred in refusing to recuse himself because he was related to the deceased.
IV. The appellant's confession was obtained as a result of an illegal arrest and without an intelligent waiver of his rights.
V. The jury selection process was discriminatory and unconstitutional.
VI. The jury was prejudiced by dining in the Forrest County jail complex and seeing the appellant in prison garb.
These will be dealt with rather briefly because the facts were undisputed as to the defendant firing the fatal shots.

I.

DID THE TRIAL JUDGE ERR IN REFUSING TO RECUSE HIMSELF?
On a pretrial hearing of a motion to suppress, the trial judge, Jack B. Weldy, reprimanded one of the defense attorneys for attempting to circumvent the court's sustaining objections to the evidence by asking the same or similar questions over again. Judge Weldy, in denying the motion to recuse himself, the hearing on which was held a day or so later outside the presence of the jury, admitted that he had misunderstood defense counsel's demeanor and attitude during the pretrial hearing, advised *643 defense counsel that he was not opinionated toward either side, reaffirmed his complete confidence in both defense attorneys' capability and integrity, and further stated:
"[I]t is the purpose of this Court in each case, and it will be in this case, within the limit of the human capabilities of the Judge, to afford this Defendant a trial in which all of his Constitutional rights are protected. It is further the opinion of this Court that the present counsel have up to this time, and the Court is confident that the present counsel will, during the trial, afford this Defendant all that he's entitled to in a trial of this nature, and certainly the remarks of the Court were not in any way intended to reflect upon the integrity or the ability of defense counsel."
A more difficult issue raised by the appellant is that Judge Weldy should have recused himself because of his relationship to the deceased. This fact was not made known to defense counsel until the trial was over and when the appellant was heard on his motion for a new trial. At that time all parties, including the defendant, retired to the judge's chambers and Judge Weldy stated:
"For the record, let it be reflected that my middle initial is `B' and it stands for Burkett. I am advised that there is a relationship between the deceased Harry Burkett and me, but it's beyond the third degree in civil law. I'm not sure whether the deceased was a second or third cousin of my father, but I thought the record should reflect that. The record should further reflect that I have never visited in the home of the deceased nor has he ever visited in my home; that I have never gone to any family reunion, if there has been one, and that I only knew the deceased casually. Anything further you want to put in here?
BY HON. S. ROBERT HAMMOND, JR.:
No, sir, Judge.
BY THE COURT:
Let me say this. I was aware, as all judges are, of the requirements of the Code of Judicial Conduct when parties or attorneys appear before the Court and there is a relationship within the third degree according to civil law. And I was aware of this prior to going into the trial, and because the relationship is so distant, certainly the fact that the last name of the deceased coincides with my middle name did not in any way affect the ruling of this Court during the course of the trial and did not in any way affect the conduct of the trial which I have previously determined to be a completely fair and impartial trial for the Defendant. Is there anything further you want to put in?
BY HON. S. ROBERT HAMMOND, JR.:
I would say on behalf of the Defendant we do appreciate the disclosure and I would like to say for the record we were not aware of the relationship before the trial and appreciate the Court's disclosure."
Section 165 of the Mississippi Constitution, repeated in almost identical language in Mississippi Code Annotated section 9-1-11 (1972), provides in part:
"No judge of any court shall preside on the trial of any cause, where the parties or either of them, shall be connected with him by affinity or consanguinity, or where he may be interested in the same, except by the consent of the judge and of the parties."
This constitutional provision was construed in Black v. State, 187 So.2d 815 (Miss. 1966), wherein this Court said:
"A trial judge should avoid sitting in a case where the sole prosecuting witness is a near relative, and who is interested in the outcome of the prosecution. For example: A judge should not sit in a case where defendant is being tried for the rape of a close relative of the judge." 187 So.2d at 819 (Emphasis added).
In Black, the prosecuting witness was a first cousin of the trial judge. In the case at bar, Judge Weldy stated that he was "not sure whether the deceased was a second or third cousin of my father, . .". This would make Judge Weldy at most a third or fourth cousin. Under any stretch *644 of the imagination he would not be a near or close relative.
The evidence was overwhelming, in fact it was undisputed, that Coleman fired the fatal shots. In his written confession, the defendant himself admitted that he fired the fatal shots. So the jury reached the only conclusion that it could reach on the guilt phase of the trial. Moreover, the record as a whole reflects no bias or prejudice whatsoever on the part of Judge Weldy. On the contrary, his statements and rulings reflect the utmost concern for the rights of the defendant.
In Garrett v. State, 187 Miss. 441, 193 So. 452 (1940), this Court said:
"Primarily, he is to judge his own qualification and fairness, and unless a record reflects an abuse of his powers to the extent of showing probable injustice, the Court here will not reverse a case upon such grounds." 187 Miss. at 455, 193 So. at 455. See also, Clark v. State, 209 Miss. 586, 48 So.2d 127 (1950).
There was no showing of injustice or prejudice. Therefore, no reversible error was committed when the trial judge overruled the motion to recuse himself, and overruled the motion for a new trial based on this ground.

IV.

WAS THE APPELLANT'S CONFESSION OBTAINED AS A RESULT OF AN ILLEGAL ARREST AND WITHOUT AN INTELLIGENT WAIVER OF HIS RIGHTS?
Coleman contends that his confession should have been suppressed because his warrantless arrest was without probable cause and his rights' waiver was ineffective due to his age, intelligence, and inability to talk with a parent.
Probable cause for arrest has been defined to be more than a bare suspicion but less evidence than would be sufficient to support a conviction. Rome v. State, 348 So.2d 1026 (Miss. 1977); Powe v. State, 235 So.2d 920 (Miss. 1970).
While investigating the shooting, W.D. Hopstein found a 410-gauge paperhull shotgun shell, an uncommon shell, at the scene. He was advised that Coleman and Sims were suspects in a burglary committed a few days earlier in which a 410-gauge shotgun and paperhull shotgun shells had been taken. Deputy Hopstein then questioned the owner of the stolen shotgun, Robert Gasaway, who identified the shell found as being the same type stolen from him and placed Sims and Coleman near his house at the time the burglary was committed. Additionally, B.F. Sullivan told Hopstein that he had seen Coleman the morning after the burglary carrying what appeared to be a 410-gauge shotgun, and that he was attempting to conceal it. Hopstein also was aware that Coleman had been arrested once before for burglary. Based on all the above information and the fact that Coleman was positively recognized by Mrs. Burkett when he aimed the gun at her after shooting her husband, Hopstein ordered the arrest of the defendant. The facts known to Hopstein provided much more than a bare suspicion, and were sufficient to constitute probable cause for the arrest of Coleman.
The appellant's claim that his age, intelligence, and inability to talk with a parent negated his rights' waiver is without merit. The appellant does not contend that his Miranda rights were not given, but that he was incapable of waiving those rights.
Age and intelligence level are factors to be considered in determining whether a waiver and a confession are free and voluntary, but are not controlling. Saucier v. State, 328 So.2d 355 (Miss. 1976); Stewart v. State, 273 So.2d 167 (Miss. 1973); McLeod v. State, 229 So.2d 557 (Miss. 1969). Although the 16-year-old appellant here allegedly had only a fourth grade reading level, he testified during the hearing to suppress that each question on the rights' waiver had been read to him by the officers, that he answered as indicated on the rights' waiver form, and that he gave his statement after answering the waiver questions, and that he signed each page of his confession. Officers Roberson and Howell testified *645 that the appellant understood his rights, was not abused or threatened, and knowingly and intelligently waived his rights. The evidence adequately supports the trial court's determination that the appellant was capable of and did voluntarily waive his rights, and confess.

V.

WAS THE JURY SELECTION UNCONSTITUTIONAL?
The appellant makes general allegations that the jury, composed of 11 whites and 1 black, was not a jury of his peers. His contention seems to be that the district attorney's action, in exercising 11 of his peremptory challenges against potential black jurors, was discriminatory.
The record is devoid of any evidence of any discriminatory pattern in the selection of the special venire, the regular venire, the excusing of jurors by the court, or the peremptory challenges exercised by the district attorney. This Court upheld a murder conviction where the State exercised its peremptory challenges to exclude all Negroes from the jury panel. Irving v. State, 228 So.2d 266 (Miss. 1969), vacated as to death penalty, 408 U.S. 935, 92 S.Ct. 2857, 33 L.Ed.2d 751 (1972).

VI.

WAS THE JURY CONTAMINATED BY DINING IN THE FORREST COUNTY JAIL COMPLEX AND SEEING THE APPELLANT IN PRISON GARB?
During the hearing on his motion for a new trial, the appellant produced only one of three jurors who allegedly saw the appellant dressed in prison garb in the jail complex. This juror, Charles Morris, testified that while being led with the other jurors in single file through the complex to the cafeteria, he looked over his shoulder down a hallway and through an open door and saw the appellant for several seconds sitting at a table, dressed in an orange jumpsuit. Morris further testified that he was not shocked to see the appellant there and assumed he was being kept there. The testimony from this single juror fails to support a presumption that the jury was tainted. In the absence of any evidence or indication that the jury was prejudiced on account of this incident or that the appellant did not receive a fair trial, the motion based on this ground was properly denied.
There being no reversible error in these four assignments of error and the proof being overwhelming and without contradiction that the appellant shot and killed Burkett while in the commission of the crime of burglary or attempted burglary, the conviction is hereby affirmed.
These six assignments of error have to do with the sentencing phase:
II. The trial court erred in instructing the jury to consider only the mitigating circumstance of age.
III. Section 99-19-101 is unconstitutional for the following reasons:
(a) The burden of proof was impermissibly shifted to the defendant during the sentencing phase.
(b) The defendant was unconstitutionally denied a presentencing report.
(c) The death penalty is cruel and unusual punishment in violation of the 8th and 14th amendments.
(d) The statute fails to provide adequate guidelines for appellate review.
(e) The "especially heinous, atrocious or cruel" aggravating circumstance is vague and overbroad.
(f) The State is allowed to present unlimited evidence at the sentencing stage.
VII. The trial court erred in admitting photographs of the deceased during the penalty stage of the trial which it had excluded during the guilt phase of the trial.
VIII. The trial court erred in overruling a motion for mistrial because of prejudicial and improper closing arguments made by the district attorney during the penalty phase.

*646 IX. The jury was required to state in its verdict the specific facts upon which it based its sentence of death.
X. The appellant's death sentence should be commuted by this Court to life in prison.

II.

DID THE TRIAL COURT ERR BY INSTRUCTING THE JURY TO CONSIDER ONLY THE MITIGATING CIRCUMSTANCE OF AGE?
The appellant was 16 years of age at the time of the killing of Burkett, and this was the only mitigating circumstance that the trial judge instructed the jurors that they could consider. This was in spite of vigorous defense objections that other mitigating circumstances concerning emotional disturbance and extreme duress at the time of the shooting should also be included in the instructions to the jury. The trial judge's limiting instruction was clearly erroneous in view of the decision of the United States Supreme Court in Lockett v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), and this Court's decisions in Jackson v. State, 337 So.2d 1242 (Miss. 1976), and Washington v. State, 361 So.2d 61 (Miss. 1978).
In Lockett, the United States Supreme Court said that the sentencing jury must:
"... not be precluded from considering as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." 438 U.S. at 604, 98 S.Ct. at 2965, 57 L.Ed.2d at 990. (Emphasis added).
In Washington, supra, this Court said:
"In Jackson v. State of Mississippi, 337 So.2d 1242 (Miss. 1976), this Court said:
`At this hearing, the defendant may prove his lack of a prior criminal record as a mitigating circumstance and may also adduce proof of any other circumstance or combination of circumstances surrounding his life and character or the commission of the offense with which he is charged that would be reasonably relevant to the question of whether he should suffer death or be sentenced to life in prison.' (Emphasis added).
"It is crystal clear from our holding in Jackson that this Court is committed to the `individualized consideration of mitigating factors' in each case, and that the only limitation placed on the introduction of evidence of mitigating circumstances is that it must be reasonably relevant." 361 So.2d at 68 (Emphasis added).

III.

(a) DOES SECTION 99-19-101 SHIFT THE BURDEN OF PROOF TO THE 
DEFENDANT DURING THE SENTENCING PHASE?
The appellant contends that the capital murder statute (Section 99-19-101) unconstitutionally shifts the burden of proof to the defendant during the separate sentencing phase because the evidence adduced during the guilt phase of the trial proving murder during the commission of a burglary also proves an aggravating circumstance, thus requiring the defendant to come forward with proof of mitigating circumstances or automatically have the death penalty imposed. This contention is without merit because the statute does not automatically require the jury to impose death when aggravating circumstances are shown in the absence of mitigating circumstances.
Subsection 5 of § 99-19-101 limits the aggravating circumstances to eight, but proof of one or more of these aggravating circumstances may still be found insufficient by the jury to require death. Throughout the trial on the sentencing phase, the state carries the burden of showing not only that aggravating circumstances exists but also that they are sufficient enough to warrant death. If the state merely proves the existence of an aggravating circumstance, the jury is free to find it insufficient to warrant death and is not required to automatically impose death. *647 Mississippi's capital murder statute leaves the appellant the option of presenting evidence (mitigating circumstances) on why the death penalty should not be imposed, without requiring him to do so.
In Jordan v. State, 365 So.2d 1198 (Miss. 1978), a similar argument was made that the burden of proof on mitigating circumstances was shifted to the defendant under the procedures outlined in Jackson v. State, 337 So.2d 1242 (Miss. 1976). This Court held that the burden of proof was on the state and Jackson required that a defendant be given an opportunity to present evidence of any and all mitigating circumstances. Although the appellant was tried under the statute here, the logic of Jordan applies equally well considering the statutory requirement of sufficient aggravating circumstances.

(b) WAS THE APPELLANT UNCONSTITUTIONALLY DENIED A PRESENTENCE 
REPORT DURING THE SENTENCING PHASE?
Mississippi Code Annotated (1978 Supp.), section 47-7-9 provides:
"Presentence investigators shall conduct presentence investigations on all persons convicted of a felony in any circuit court of the state, prior to sentencing and at the request of the circuit court judge of the court of conviction." (Emphasis added).
Under the statute, the presentence investigation is discretionary with the circuit court judge and not mandatory, as the appellant suggests. The necessity of an investigation is thus left to the trial judge's sound discretion.

(c) IS THE DEATH PENALTY CRUEL AND UNUSUAL PUNISHMENT IN 
VIOLATION OF THE 8th AND 14th AMENDMENTS?
This contention is without merit. The constitutionality of the death penalty as imposed under section 99-19-101 et seq. has been firmly established. Proffitt v. Florida, 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976); Washington v. State, 361 So.2d 61 (Miss. 1978).

(d) IS THE DEATH STATUTE UNCONSTITUTIONAL FOR FAILING TO PROVIDE 
GUIDELINES FOR APPELLATE REVIEW OF DEATH PENALTY CASES?
The appellant principally argues here that in determining whether his death sentence has been wantonly and freakishly imposed, the facts and circumstances of his case should be compared not only to other cases where the death penalty was upheld but also to all cases with similar facts and circumstances including those where life imprisonment was the sentence. We feel that a comparison with other cases where the death penalty was upheld is constitutionally adequate and judicially manageable.
A similar attack was made on the vagueness of appellate review of death cases under the Florida statute, which is similar to the Mississippi statute, in Spinkellink v. Wainwright, 578 F.2d 582 (5th Cir.1978). In Spinkellink, in dismissing this attack upon the appellate review procedure, the Fifth Circuit Court of Appeals cited the concurring opinion of Justices Stewart, Powell and Stevens, in Proffitt v. Florida, supra:
"Nonetheless the petitioner attacks the Florida appellate review process because the role of the Supreme Court of Florida in reviewing death sentences is necessarily subjective and unpredictable. While it may be true that that Court has not chosen to formulate a rigid objective test as its standard of review for all cases, it does not follow that the appellate review process is ineffective or arbitrary. In fact, it is apparent that the Florida Court has undertaken responsibly to perform its function of death sentence review with a maximum of rationality and consistency. For example, it has several times compared the circumstances of a case under review with those of previous cases in which it has assessed the imposition of death sentences. See, e.g., Alford v. State, 307 So.2d 433, 445 (Fla. 1975); Alvord v. State, 322 So.2d 533, 540-541 (Fla. *648 1975). By following this procedure the Florida Court has in effect adopted the type of proportionality review mandated by the Georgia statute." 578 F.2d at 601-02.
Spinkellink specifically stated a comparison to all death cases where the convicted murderer was given life was not required by Proffitt. Such review "... would be never ending and the benchmark for comparison would be chronically undefined." 578 F.2d at 604-05.

(e) IS THE "ESPECIALLY HEINOUS, ATROCIOUS, OR CRUEL" AGGRAVATING 
CIRCUMSTANCE [Sec. 99-19-101(5)(h)] VAGUE AND OVERBROAD IN 
VIOLATION OF THE DUE PROCESS CLAUSE?
The appellant's argument that this aggravating circumstance is vague and overbroad is identical to the argument made in Washington v. State, supra. We rejected this argument in Washington, and again reject it here.
In Washington, this Court said:
"In our opinion the words `especially heinous, atrocious or cruel' are not confusing nor likely to be misunderstood by the average citizen. The average citizen has a reasonable knowledge of the generally accepted meaning of these words. He comes in contact with these words frequently, if not in personal conversation at least through the news media of television, radio or the press." 361 So.2d at 65.
In rejecting an identical argument in Spinkellink, the Fifth Circuit said:
"Again, we feel that the meaning of such terms is a matter of common knowledge, so that an ordinary man would not have to guess at what was intended. ... What is intended to be included are those capital crimes where the actual commission of the capital felony was accompanied by such additional acts as to set the crime apart from the norm of capital felonies  the conscienceless or pitiless crime which is unnecessarily torturous to the victim." 578 F.2d at 611. (Emphasis added).

(f) IS THE DEATH STATUTE UNCONSTITUTIONAL BECAUSE THE STATE IS 
ALLOWED TO PRESENT UNLIMITED EVIDENCE AT THE SENTENCING STAGE?
Appellant next contends that under this language of Mississippi Code Annotated section 99-19-101(1) (1978 Supp.):
"In the proceeding, evidence may be presented as to any matter that the court deems relevant to sentence, and shall include matters relating to any of the aggravating or mitigating circumstances. However, this subsection shall not be construed to authorize the introduction of any evidence secured in violation of the Constitutions of the United States or of the State of Mississippi."
the State may introduce any evidence unrelated to aggravating circumstances.
Subsection (5) of § 99-19-101 plainly states that the aggravating circumstances "shall be limited" to the eight aggravating circumstances listed. Read in conjunction with subsection (1), the State is limited to introducing evidence relevant to one or more of the eight enumerated aggravating circumstances.
This assignment of error is without merit.

VII.

DID THE TRIAL COURT ERR IN ADMITTING PHOTOGRAPHS OF THE DECEASED DURING THE PENALTY PHASE OF THE TRIAL?
The two pictures complained of were color photographs showing where the shotgun pellets hit the victim on the right side of his head, his lower right arm, and on the left side of his chest.
The trial court's ruling was that the state was entitled to introduce these two pictures to support its burden of proving that the offense was "especially heinous, atrocious or cruel". The trial court also granted a jury instruction, over defense objections, that the jury could consider the aggravating circumstance that the offense was especially heinous, atrocious or cruel.
*649 The admission of the two pictures on this basis was not error, as they had some probative value along this line of reasoning.

VIII.

SHOULD THE TRIAL COURT HAVE GRANTED A MISTRIAL BECAUSE OF PREJUDICIAL AND IMPROPER CLOSING ARGUMENTS BY THE DISTRICT ATTORNEY DURING THE PENALTY PHASE?
After the jury had retired for sentencing deliberations, the appellant moved for a mistrial, contending that the district attorney's statements during closing arguments about weighing the two aggravating circumstances against the one mitigating circumstance, the "revolving prison doors", and the deterrent effect of the death penalty, were impermissible and prejudicial. The record does not contain the closing arguments and objection was not made contemporaneously with the statements.
Where a defendant fails to object to a statement by the district attorney during closing argument, a motion for mistrial after the jury has retired to consider its verdict comes too late. Coburn v. State, 250 Miss. 684, 168 So.2d 123 (1964).

IX.

IS THE JURY REQUIRED TO STATE THE SPECIFIC FACTS UPON WHICH IT BASED ITS SENTENCE OF DEATH?
Mississippi Code Annotated (1978 Supp.), subsection (3) of section 99-19-101, requires:
"(3) For the jury to impose a sentence of death, it must unanimously find in writing the following:
(a) That sufficient aggravating circumstances exist as enumerated in subsection (5) of this section; and
(b) That there are insufficient mitigating circumstances, as enumerated in subsection (6), to outweigh the aggravating circumstances."
The jury verdict complained of was:
"We the jury unanimously find that the aggravating circumstance of:
1) The capital murder was committed while the defendant was engaged in commission of burglary and/or attempted burglary
is sufficient to impose the death penalty and that there are insufficient mitigating circumstances to outweigh the aggravating circumstance."
Neither Mississippi's statute, nor the decisions of the United States Supreme Court and this Court, require such detailed findings; hence this contention is without merit.
In Jurek v. Texas, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976), the United States Supreme Court approved a statutory scheme which merely required the jury to answer three general questions on aggravating circumstances. No specific findings of fact were required under the statute, merely "yes" or "no" answers to the questions. The requirement in our statute [subsection (3) of § 99-19-101] that the jury indicate the aggravating circumstance or circumstances relied on, provides an even better basis for review than the Texas statute approved in Jurek.

X.

SHOULD THE APPELLANT'S DEATH SENTENCE BE COMMUTED BY THIS COURT 
TO LIFE IMPRISONMENT?
Mississippi Code Annotated section 99-19-105 (1978 Supp.) provides:
"(2) The Mississippi Supreme Court shall consider the punishment as well as any errors enumerated by way of appeal.
(3) With regard to the sentence, the court shall determine:
(a) Whether the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor;
(b) Whether the evidence supports the jury's or judge's finding of a statutory aggravating circumstance as enumerated in section 99-19-101; and

*650 (c) Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.

(4) Both the defendant and the state shall have the right to submit briefs within the time provided by the court, and to present oral argument to the court.
(5) The court shall include in its decision a reference to those similar cases which it took into consideration. In addition to its authority regarding correction of errors, the court, with regard to review of death sentences, shall be authorized to:
(a) Affirm the sentence of death; or
(b) Set the sentence aside and remand the case for modification of the sentence to imprisonment for life." (Emphasis added).
In accordance with the legislative mandate, we have considered these similar cases where the victim was killed during the course of a robbery and the death sentence was imposed:

Irving v. State, 361 So.2d 1360 (Miss. 1978);

Washington v. State, 361 So.2d 61 (Miss. 1978);

Bell v. State, 360 So.2d 1206 (Miss. 1978).
Having carefully compared the case at bar with these cases in which the sentence of death was imposed, we are of the opinion that the sentence of death in this case "is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant."
In Irving, Washington and Bell, the killings were totally senseless and committed upon hapless victims unarmed and unable to protect themselves. The circumstances in this case are strikingly different. Here, Harry Burkett, the victim, upon seeing the foot of Sims protruding from under the pickup truck, began firing his pistol. Only after being fired upon did the 16-year-old Coleman shoot. Again, Coleman had the opportunity to shoot Mrs. Burkett, who was an eyewitness, but did not. He fled the scene instead.
Under the specific authorization of subsection (5)(b) of § 99-19-105, this Court affirms the conviction but reverses and sets aside the death sentence and remands this case to the trial court for modification of the sentence to imprisonment for life.
AFFIRMED AS TO THE GUILT PHASE; REVERSED AND REMANDED AS TO THE SENTENCING PHASE FOR MODIFICATION OF SENTENCE TO IMPRISONMENT FOR LIFE.
AS TO THE GUILT PHASE:
SMITH, P.J., and SUGG, BROOM, BOWLING and COFER, JJ., concur.
PATTERSON, C.J., WALKER and LEE, JJ., dissent.
AS TO THE SENTENCING PHASE:
PATTERSON, C.J., SMITH, P.J., SUGG and BROOM, JJ., concur.
LEE, WALKER, BOWLING and COFER, JJ., dissent.
LEE, Justice, dissenting:

GUILT PHASE
I dissent from the majority opinion on the guilt phase of the trial and would reverse and remand for a new trial on all issues, for the reason there was a clear violation of Section 165, Miss.Const. 1890, which provides that no judge of any court shall preside on the trial of any cause, where the parties, or either of them, shall be connected with him by affinity or consanguinity, or where he may be interested in the same, except by the consent of the judge and of the parties, and Mississippi Code Annotated Section 9-1-11 (1972), which is a restatement of that constitutional provision.
Black v. State, 187 So.2d 815 (Miss. 1966) and Garrett v. State, 187 Miss. 441, 193 So. 452 (1940), quoted by the majority do not support its opinion.
In Black the trial judge was a cousin of the prosecuting witness and this Court said:
"We have carefully reviewed the motion of appellant requesting the trial judge to recuse himself upon the ground of kinship, and have considered the ruling *651 of the judge in which he stated he was a first cousin of the prosecuting witness, R.L. Harmon. We have reached the conclusion that the motion should have been sustained and the trial judge should have recused himself.
Section 165 Article 6, Mississippi Constitution of 1890 provided in part that:
`No judge of any court shall preside on the trial of any cause, where the parties or either of them, shall be connected with him by affinity or consanguinity, or where he may be interested in the same, except by the consent of the judge and of the parties.'
Although it is obviously not necessary, nevertheless, section 165 of the Constitution is implemented by Mississippi Code Annotated section 1651 (1956)." 187 So.2d at 818-819.
In Garrett, the trial judge was not related to the parties or witnesses, but was a close friend of the prosecuting witness. In holding that the trial judge was not disqualified by Section 165, Miss.Const. 1890, the Court said:
"The judge also stated that he had known the defendant, Sam Garrett, longer than he had known the prosecuting witness, and that their relationship in the past had been very cordial and friendly. He overruled the motion, and his action in refusing to recuse himself is assigned as error. Section 165 of the Mississippi Constitution of 1890 prescribes the cases wherein a judge shall not preside. It provides that `No judge of any court shall preside on the trial of any cause, where the parties or either of them, shall be connected with him by affinity or consanguinity, or where he may be interested in the same, except by the consent of the judge and of the parties.' This section also provides, in the case of disqualification, how a judge shall be selected to preside." 187 Miss. at 453-454, 193 So. at 455.
The Court further stated in Black that the Constitution specifies what constitutes disqualification and a judge cannot be disqualified from presiding at any trial unless he is disqualified within such provisions.
In Cashin v. Murphy, 138 Miss. 853, 103 So. 787 (1925), a motion was filed for the chancellor to recuse himself in a civil case because of his hostility to Cashin. The Court held:
"In the instant case, it not being shown that the chancellor was interested or related to the parties by affinity or consanguinity, we are compelled to hold that the recusation motion was properly overruled, and the case will be remanded, that the chancellor may proceed with the trial of the case." 138 Miss. at 867-868, 103 So. at 791.
The Constitution does not provide what degree of relationship shall exist between the trial judge and the party or prosecuting witness, nor do I find any case in Mississippi that so prescribes. There are instances where third or fourth cousins may be closer than first cousins. In the present case, the trial judge bore the last name of the victim as his middle name. He was related to the victim by consanguinity. He was related to the victim's wife, a prosecuting witness, by affinity. Regardless of the fact that the trial judge may have presided fairly, in all respects, during the trial, still Section 165 of the Constitution controls and disqualifies him in the case. In all cases, particularly in one of this magnitude, courts and trial judges must be like Caesar's wife  beyond suspicion.

SENTENCING PHASE
The majority opinion, having affirmed this case on the guilt phase, by which decision I am bound, I do now dissent from the majority opinion in the sentencing phase, and would affirm the sentence of death, for the reason that, in my view, when the present case is compared to Irving v. State, 361 So.2d 1360 (Miss. 1978); Washington v. State, 361 So.2d 61 (Miss. 1978); and Bell v. State, 360 So.2d 1206 (Miss. 1978); and other capital murder cases decided by this Court, I do not think that the death penalty here is disproportionate to that imposed in those cases, considering both the crime and the defendant.
*652 Irving, Washington and Bell were convicted of capital murder committed during, or immediately after, the times they robbed the victims. In Irving and Washington, there is no evidence that the crimes were planned for any appreciable time prior to their commission, or with specific intent to kill the victims, except by the fact that they were armed with deadly weapons. In Bell, the murder was committed in gangland style some time after the robbery.
In the present case, James Sims, Jr., an accomplice, testified clearly and positively that the appellant came to him one week prior to the murder and told him they could get some money from Mr. Harry Burkett (deceased) and he asked appellant "How we was going to get it," and appellant replied, "... he was going to kill him." On Wednesday night before the homicide on Thursday night, they went to the home of Mr. Burkett for the purpose of robbing him. Appellant had a 410-gauge shotgun. The robbery was thwarted because no lights were in the house and the Burketts were not at home. At approximately 9:00 the next morning (day of the homicide) Sims had another conversation with appellant and he asked appellant "Was there any other way besides killing him?" and appellant said, "It wasn't because he didn't want no witness there." On that Thursday night, appellant and Sims went to the home of Mr. Burkett, appellant having previously vowed to rob and kill him. Mr. and Mrs. Burkett were not at home, but arrived during the burglary of Mr. Burkett's pickup truck by the robbers, who hid under the truck. Mr. Burkett shot at Sims' feet, whereupon, Sims ran from the opposite side of the truck and appellant shot and killed Burkett. In the meantime, Mrs. Burkett, who had gone inside the house, returned. Appellant pointed his weapon at her, but fled without shooting her. Shortly afterwards, when he regrouped with Sims, he told Sims, "He would have shot his wife too, ... but didn't have time."
The majority opinion indicates that appellant's reward for killing Mr. Burkett, when he fired his pistol at Sims' feet and for not killing Mrs. Burkett, is, or should be, his escape from the gas chamber. When a person arms himself with the avowed purpose of robbing a citizen and of killing his victim in order to remove him as a witness and then fulfills such purpose, and kills that citizen in committing, or attempting to commit, the robbery, and the jury finds that the aggravating circumstances outweigh the mitigating circumstances, and that the murderer should suffer the death penalty, and where, as here (in my opinion) the death penalty was not excessive or disproportionate to penalties imposed in similar cases and was not capriciously imposed, I think the verdict of the jury and the judgment of the trial court should stand.
GUILT PHASE:
PATTERSON, C.J., and WALKER, J., join in this dissent.
SENTENCING PHASE:
WALKER, BOWLING and COFER, JJ., join in this dissent.
PATTERSON, Chief Justice, concurring in part and dissenting in part:
I concur in the dissenting opinion of Justice Lee as it concerns the guilt phase of the trial.
The majority opinion is decisive, however, on guilt which causes me to concur in the remand to the trial court for modification of the sentence to imprisonment for life.