435 So.2d 664 (1983)
George David TOKMAN
v.
STATE of Mississippi.
No. 53676.
Supreme Court of Mississippi.
June 1, 1983.
Rehearing Denied August 17, 1983.
*666 Moore, Royals & Taylor, Robert H. Taylor, Jr., Russell D. Moore, III, Jackson, for appellant.
Bill Allain, Atty. Gen. by Frankie Walton White, Sp. Asst. Atty. Gen., Ed Peters, Dist. Atty., Jackson, for appellee.
En banc.
PATTERSON, Chief Justice, for the Court:
George David Tokman appeals a conviction of capital murder and sentence of death by a jury in the Circuit Court of the First Judicial District of Hinds County. It is a companion case to Leatherwood v. State, 435 So.2d 645 (Miss. 1983).
Shortly after midnight on August 24, 1980, Sergeant Addison of the Jackson Police Department observed a Veterans Cab parked behind Meadowbrook Cinema. Lying beside the cab was the body of a black male, later identified as that of Albert Taylor, 65 years of age. An autopsy revealed his death resulted from blows to the head by a dull blunt instrument. Other investigation disclosed a latent fingerprint taken from the right rear window of the cab matched that of Tokman.
Diane Pettway, a nurse at Regional Medical Center in Vicksburg, testified that on August 24, 1980, at approximately 1:30 a.m., three white males came into the emergency room of the center and one, who identified himself as George David Tokman, age 17, had blood on his clothes and a cut on his hand. She testified Tokman was treated by placing five stitches in his right hand between the knuckle and the wrist.
Jeffery Booth testified that on August 29, 1980, while in the Army and stationed at Fort Polk, Louisiana, he was associated with George David Tokman, Michael Leatherwood and Jerry Fuson. He stated that Tokman told him that he, Leatherwood and Fuson had killed a cab driver in Jackson, Mississippi. According to him, Tokman displayed a newspaper account of the murder and bragged of the incident.
More detailed facts of the crime were established by the testimony of Jerry Booth, James Kellison, also stationed at Fort Polk, and Jerry Fuson.
On or about August 22, 1980, Tokman, Fuson and Leatherwood, all in the military and stationed at Fort Polk, Louisiana, were in Jackson, Mississippi, to obtain Fuson's car which had been previously left in the city. After remaining in Jackson for about a day and a half the three decided they would rob a cab driver since they were without funds. According to Fuson's testimony Leatherwood and Tokman decided they would kill the victim. The first cab called was driven by a young, large driver who they thought would be difficult to manhandle so a second cab was called which was driven by Albert Taylor, an elderly man.
The three entered Taylor's cab, with Fuson occupying the passenger's side of the front seat, Leatherwood occupying the left side of the rear seat and Tokman occupying the right side of the rear seat. They directed the driver to an address on Beaverbrook and upon arriving there requested him to dim his lights whereupon Leatherwood placed a rope around the driver's neck and pulled him into the back seat. Meanwhile Fuson stopped the cab and Tokman came to the driver's seat and drove the cab to the rear of Meadowbrook Cinema. Fuson then left the cab to obtain his car and upon returning for Leatherwood and Tokman observed that Tokman's hand was cut. After departing the scene Leatherwood made the statement that Tokman stabbed him, not denied by Tokman, and later Tokman stated that he had cut his hand while stabbing the cab driver. Further evidence revealed *667 that Taylor was robbed of approximately $11.50, a pistol, his wallet, two money bags and a set of keys.
Tokman first contends the trial court erred in granting the state's challenge to venireman Dewitt Jordan for cause. He argues this was error under Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). Jordan expressed conscientious scruples against the death penalty during voir dire of the jury by the prosecution. Later the court, after explaining that the first part of the trial dealt only with the guilt or innocence of the defendant and not with the imposition of the death penalty, asked the following question: "That is, during the first phase, could you still vote guilty even though that could result in the death penalty after the jury considers it in the second phase?" Jordan replied, "I don't think I could." When asked by the prosecution whether it was correct that he was saying that he could not vote guilty knowing it could result in the death penalty Jordan replied, "Yes, sir."
In Evans v. State, 422 So.2d 737 (Miss. 1982), we reiterated the procedures we had approved in Irving v. State, 361 So.2d 1360 (Miss. 1978). We there stated:
Following Witherspoon, this Court considered the procedure to be employed by trial judges in Myers v. State, 254 So.2d 891 (Miss. 1971). That procedure follows:
"`The proper method of bringing the death penalty to the attention of the special venireman is for the trial judge to inform them that they have been summoned as veniremen in a capital case and that a verdict of guilty could result in the infliction of the death penalty. The judge should then ask them if any member of the panel has any conscientious scruples against the infliction of the death penalty, when the law authorizes it, in proper cases, and where the testimony warrants it. If there are those who say that they are opposed to the death penalty, the trial judge should then go further and ask those veniremen, who have answered in the affirmative, whether or not they could, nevertheless, follow the testimony and the instructions of the court and return a verdict of guilty although that verdict could result in the death penalty, if they, being the judges of the weight and worth of the evidence, were convinced of the guilt of the defendant and the circumstances warranted such a verdict. Those who say that they could follow the evidence and the instructions of the court should be retained, and those who cannot follow the instructions of the court should be released. The mere fact that a venireman is opposed to the death penalty does not disqualify him as a juryman, if he can do his duty as a citizen and juror and follow the instructions of the court, and where he is convinced of the defendant's guilt he can convict him although the verdict of the jury may result in the death penalty's being inflicted upon the defendant.' (Emphasis added). Armstrong v. State, Miss., 214 So.2d 589, at 593." 254 So.2d at 893-94. [361 So.2d at 1360].
422 So.2d at 740-41.
The trial court meticulously followed the procedure outlined in Evans although the prospective juror was somewhat rehabilitated by questions of defense counsel, one of which was,
"BY MR. MOORE: So there is the possibility that you could vote for the death penalty in a case if the facts warranted in your mind the crime was heinous enough or bad enough.
BY MR. JORDAN: Yes, sir."
Nevertheless, a review of Jordan's overall responses to questions by the state and defense counsel portrays the prevailing tenet that he was opposed to the death penalty and could not be a fair and impartial juror for the state. We therefore are of the opinion the trial court did not err in dismissing venireman Jordan for cause.
The appellant next contends there was error in granting State's instruction No. S-3 in that the Mississippi statutes on capital murder are unconstitutional. Under the decisions in Bullock v. State, 391 So.2d 601 (Miss. 1981) and Coleman v. State, 378 So.2d *668 640 (Miss. 1979), this assignment of error is without merit.
In Tokman's third assignment for reversal he argues the trial court erred in restricting the cross-examination of State's witness Kellison concerning prior convictions and false statements made upon entering the United States Army. The witness was asked by defense counsel whether at the time of his enlistment he informed the Army of his convictions before he was 17 years of age to which Kellison replied that he told the recruiter but the convictions were not listed. Kellison was then asked whether he had to sign something attesting to the truthfulness of the information he gave the Army and an objection based upon the inadmissibility of convictions under the Youth Act was sustained. From this exchange Tokman now contends the information was admissible as a material factor reflecting upon Kellison's truthfulness in his answers. The trial court questioned the materiality of such testimony and ruled that it was improper.
In Shanklin v. State, 290 So.2d 625, 627 (Miss. 1974), we stated: "A defendant can, of course, question a witness to determine his credibility as a witness; but as to how far afield the testimony may be extended is largely within the sound discretion of the trial judge." We are presently of the opinion the trial court did not abuse its discretion in sustaining the objections to this testimony since, at best, it appears remote to the witnesses present credibility.
It is next contended there was error in admitting as an aggravating circumstance during the sentencing phase of the trial a record of Tokman's armed robbery conviction on February 20, 1981, the robbery having been committed one day after the murder of Taylor. He argues the aggravating circumstance was improper under Miss. Code Ann. § 99-19-101(5)(b) (Supp. 1982), because the statute reads "The defendant was previously convicted of another capital offense or of a felony involving the use or threat of violence to the person," (Emphasis added). He emphasizes the statute refers to a conviction prior to the commission of the act for which he was being sentenced and therefore was inadmissible.
We addressed the identical question in Leatherwood v. State, 435 So.2d 645 (Miss. 1983), as follows:
This Court has ruled that "previously" means previous "to the time of the trial, so that a conviction between the time the capital offense was committed and the time of trial for it may be admitted into evidence as an aggravating circumstance." Jones v. State, 381 So.2d 983, 994 (Miss. 1980); Reddix v. State, 381 So.2d 999 (Miss. 1980) ...
* * * * * *
Crimes committed by a defendant after having committed a capital offense have just as much or more bearing on the question of his character, criminal tendencies, and whether he should suffer the death penalty, as do crimes committed by him prior to having committed the capital offense.
We conclude this assignment is without merit.
The appellant next argues there was error in granting State's instruction S-4 because it permitted the jury to consider as aggravating circumstances, the murder was committed while Tokman was engaged in a robbery, was committed for pecuniary gain, and the homicide was especially heinous, atrocious or cruel. When the instructions were being considered by the trial court Tokman objected to S-4 only upon the grounds "that an aggravating circumstance is that capital murder was committed while the defendant was engaged in the commission of a robbery and that is an element of capital murder itself." We are required to consider only that portion of the assignment of error which is related to the objection. Leatherwood v. State, Miss., 435 So.2d 645, supra; Smith v. State, 419 So.2d 563 (Miss. 1982). However we address each.
It is contended however that Tokman was on trial for capital murder only because under Miss. Code Ann. § 97-3-19 (Supp. 1982), he killed Taylor while engaged *669 in a robbery, and to instruct the jury that murder while committing robbery is an aggravating circumstance is tantamount to instructing the jury that after a finding of guilty, he already has one aggravating circumstance against him, sufficient to impose the death penalty.
Again, we find this contention was addressed in Leatherwood wherein we found the argument to be without merit under the following rationale:
The appellant's argument that he enters into the sentencing phase of the bifurcated trial with one strike against him is correct in one sense  i.e., if he had not been convicted of a capital offense, there would be no need for the sentencing hearing and he would simply be sentenced to serve a life term. This does not mean though that the procedure is unfair or faulty.
At the sentencing hearing appellant may put on evidence of mitigating circumstances of an unlimited nature pursuant to section 99-19-101(6) (Supp. 1982) and Washington v. State, 361 So.2d 61 (Miss. 1970), so as to convince the jury that he should not be executed.
Of course a jury in a capital case must find the defendant guilty of the attendant crime before the homicide attains capital status. Because it is an essential adjunct to the finding of guilty of capital murder, it becomes a relevant aggravating circumstance, in our opinion, to be considered by the jury in determining the sentence and as such it is not error.
It is additionally urged that instruction S-4 was improper because it permitted the jury to consider as an aggravating circumstance that the capital murder was committed for pecuniary gain. The thrust of this argument is the instruction permits the doubling of aggravating circumstances (saying the same thing twice) when the evidence would permit only one aggravating circumstance. Section 99-19-101(5)(d) lists robbery as an aggravating circumstance which in conjunction with a homicide will elevate it to capital murder. Sub-section (f) gives the aggravating circumstance, "The capital offense was committed for pecuniary gain," the same potential of elevating a homicide to capital murder. But we think an indictment, as here, charging capital murder in the course of a robbery permits instructions on both "robbery" and "pecuniary gain" as aggravating circumstances because the evidence supports both as it reveals the robbery was committed for pecuniary gain during the course of which the homicide occurred. They are inextricably intertwined in this case in our opinion. We gather from the argument there is a belief in some segments of the bar that the death sentence is imposed or is not imposed numerically.[1] However, this belief is contrary to § 99-19-101(2)(b) which provides for a "weighing" by the jury of the aggravating and mitigating circumstances in the sentencing phase and our decisions accord with this directive.
In Coleman v. State, 378 So.2d 640, 646 (Miss. 1979), we held among other things the following,
Subsection 5 of § 99-19-101 limits the aggravating circumstances to eight, but proof of one or more of these aggravating circumstances may still be found insufficient by the jury to require death. Throughout the trial on the sentencing phase, the state carries the burden of showing not only that aggravating circumstances exists but also that they are sufficient enough to warrant death. If the state merely proves the existence of an aggravating circumstance, the jury is free to find it insufficient to warrant death and is not required to automatically impose death.
We conclude there was no error in instruction S-4 arising from the aggravating circumstance of murder for "pecuniary gain."
Another argument is directed to instruction S-4 in that it permits the jury to *670 find an aggravating circumstance if they believed the capital offense was especially heinous, atrocious, or cruel because these words are unconstitutionally vague and ambiguous. This point was the subject of discussion in Washington v. State, 361 So.2d 61 (Miss. 1978), wherein we held:
We must remember that the twelve members of the trial jury were a jury of the defendant's peers, and came from the county of the defendant's residence. The jury was composed of average citizens possessing average intelligence, a cross-section, if you please, of the citizenry of the community. In our opinion the words "especially heinous, atrocious or cruel" are not confusing nor likely to be misunderstood by the average citizen. The average citizen has a reasonable knowledge of the generally accepted meaning of these words. He comes in contact with these words frequently, if not in personal conversation at least through the news media of television, radio or the press.
* * * * * *
The facts in no two cases are exactly identical and no precise definition or formula can be made to cover every possible factual situation.
It is our considered opinion that the average jury in its sound discretion and judgment understands the generally accepted meaning of the words "especially heinous, atrocious or cruel" and is able to apply these words to different factual situations without further definition of these words.
361 So.2d at 65-6.
This holding was reaffirmed in Coleman v. State, 378 So.2d 640, 648 (Miss. 1979). More recently it was again addressed in Edwards v. State, No. 53,800, (Miss. 1983). The author of this opinion joined the dissent of Justice Prather in her reasoning and belief that the language is vague. However, a majority of the court ruled otherwise and I presently yield to their views. Overall we are of the opinion instruction S-4 was not erroneously given and did not prejudice the appellant.
We are buttressed in the above determinations by a countervailing instruction which was granted. It follows, "You are instructed that you need not find any mitigating circumstances in order to return a sentence of life imprisonment." The jury was thus informed they could disregard all aggravating circumstances, even in the absence of mitigating circumstances, and return a sentence of life imprisonment if they believe it was warranted. We therefore think Tokman's contention on all points in this assignment of error are without merit.
The finding of the jury that the capital murder was especially heinous, atrocious or cruel is urged by the appellant as being without evidentiary foundation and contrary to the overwhelming weight of the evidence, as appellant's next assignment of error.
The evidence, in our opinion, supports the jury's verdict that the murder was especially heinous, atrocious or cruel where the testimony reveals without contradiction that the homicide was the result of deliberate plan, where the victim was pulled from the driver's seat of his cab into the back seat by a rope around his neck, where he struggled for some several minutes while being driven to the rear of the cinema and where he was bludgeoned to death by a knife which at some point during the struggle closed on the assailant's hand. Moreover the jury found the murder was committed while the defendant was engaged in the commission of a robbery, was committed for pecuniary gain and was committed for the purpose of avoiding lawful arrest, which in addition to the aggravating circumstances previously mentioned was supported by the evidence in our opinion. We stated in Evans v. State, 422 So.2d 737, 743 (Miss. 1982), "Even though it may be said that the facts of the homicide do not pass constitutional muster on the aggravating circumstance of being especially heinous, atrocious or cruel, three (3) other aggravating circumstances were proved by overwhelming evidence." Therefore, we think this assignment for reversal is without merit.
*671 The jury's finding that the capital murder was committed for the purpose of avoiding lawful arrest is next contended by appellant to be without evidentiary foundation and against the overwhelming weight of the evidence. In our opinion the following testimony of Fuson, a witness for the state, completely refutes this argument.
"[Fuson]
A. It was Mike Leatherwood's idea about a witness. He didn't want to leave a witness.
[Peters]
Q. So, it was your idea first that there would be a robbery.
A. Right.
Q. Whose idea was it next about whether to kill the witness?
A. Well, I believe Mike Leatherwood and David Tokman decided that. You know, I was against killing the cab driver. I didn't really speak up but, you know, at that time, I was against killing the cab driver but I really didn't say anything against killing the cab driver.
Q. How long was it before the cab driver was called to the scene that they discussed killing him and to not leave a witness?
A. It wasn't very long. It couldn't have been more than forty-five minutes."
In Leatherwood we held that the jury could properly consider such evidence, "[i]f there is evidence from which it may be reasonably inferred that a substantial reason for the killing was to conceal the identity of the killer or killers or to `cover their tracks' so as to avoid apprehension and eventual arrest by the authorities." It is, of course, also one of the aggravating circumstances authorized by § 99-19-101(5)(e). We therefore think this assignment is without merit.
The trial court refused appellant's request for instruction D-11 which follows: "You are further instructed that there is nothing which would suggest that the decision to afford an individual Defendant mercy violates the laws of this state, or your oath as jurors." It is now contended that this was error.
In Bullock v. State, 391 So.2d 601 (Miss. 1981), we stated:
Instruction D-31 would have told the jury it was instructed there is nothing that would suggest the decision to afford an individual defendant mercy violates the constitution. That statement was taken from language set forth in the opinion of Gregg v. Georgia, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976). It is simply a statement of the opinion, and was not intended as an abstract proposition of law to be given in jury instructions. 391 So.2d at 610.
But conceding the refusal of the instruction as error for the following statement only, it was cured by the granting of the previously mentioned instruction which states, "You are instructed that you need not find any mitigating circumstances in order to return a sentence of life imprisonment." The refusal of the instruction was not error.
The next assignment of error also concerns the refusal of an instruction, D-14, requested by the appellant. The trial court found instruction D-14 to be repetitious to instruction S-4 which was granted at the state's request. Both instructions contain statements that mitigating circumstances are not limited to those read to the jury. When the state objected to the instruction on the ground of repetition the only statement made by Tokman's counsel for the instruction's allowance was, "The defense does not think it would hurt to let them know that one more time." Perhaps so, but in Ragan v. State, 318 So.2d 879, 882 (Miss. 1975), we stated, "[t]he trial court is not required to grant several instructions on the same question in a different verbiage." We think this is the proper rule of law and note further that instruction D-12, obtained by the defendant, in effect states the jury need not find any mitigating circumstances in order to sentence Tokman to life imprisonment. It negated any prejudice or harm which might have resulted from refusing instruction D-14.
*672 Tokman's final contention is the sentence of death imposed by the jury was contrary to the weight of the evidence and disproportionately severe for the crime committed.
Defense counsel vigorously argued in mitigation of the death penalty that Tokman was only seventeen years of age at the time of the homicide and eighteen at the time of trial and because of his immaturity advised them that if he took the stand to testify in his own behalf he would tell the jury that he wanted to die. The attorneys further call to our attention that the record is void of any previous anti-social behavior by Tokman other than that at the time of this murder and robbery.
In Eddings v. Oklahoma, 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982), the United States Supreme Court reversed and remanded that cause based upon the imposition of the death penalty upon a youth, sixteen at the time he committed the murder, where the trial court refused to consider, as offered by the youth, mitigating circumstances of the youth's "unhappy upbringing and emotional disturbance." 455 U.S. at 109, 102 S.Ct. at 873. It need be observed that the Court did not hold that a minor, because of his youth, may not be sentenced to death, but stated:
All of this does not suggest an absence of responsibility for the crime of murder, deliberately committed in this case. Rather, it is to say that just as the chronological age of a minor is itself a relevant mitigating factor of great weight, so must the background and mental and emotional development of a youthful defendant be duly considered in sentencing. 455 U.S. at 116, 102 S.Ct. at 877.
In this case there is no testimony of mitigating circumstances arising from a troubled upbringing or of emotionally disturbed behavior. There is a statement by defense counsel to the court in the absence of the jury that Tokman's mother did not desire to attend the trial because she had laryngitis and was involved in a divorce proceeding, thereby acknowledging some indifference to his plight, we suppose, but hardly sufficient to establish a disturbed and emotional background to mitigate the death sentence. Moreover Tokman was examined by competent medical authorities and was found to be without psychosis. As author of this opinion I find it deeply disturbing that the life of a youth should be taken in punishment for his crime, the justification for it being that it is the law of this state which dictates the result if due process is afforded. Our review and study of the record discloses no reversible error arising from either misapplication of the law or facts. Indeed it reveals that due process, a fair trial in all aspects was afforded the defendant.
As mentioned we have reviewed the record and compared the death sentence with all decisions of this Court beginning with Jackson v. State, 337 So.2d 1242 (Miss. 1976), involving the death penalty. Most cases, 19, have been affirmed and few, 2, have been reversed. We conclude the death penalty for George David Tokman is not disproportionate, wanton or freakish when compared to other capital cases, their facts, these facts and the defendant. We are of the opinion from the evidence and the comparison, that the death penalty imposed by the jury is not excessive in relation to the aggravating and mitigating circumstances presented to it.
We also conclude the death sentence was not imposed because of the influence of passion, prejudice or any other arbitrary factor, and, the evidence supports the jury's finding of statutory aggravating circumstances in that the homicide was committed while the defendant was engaged in the crime of robbery, was for pecuniary gain, was for the purpose of avoiding lawful arrest, and was especially heinous, atrocious and cruel. The execution of Tokman will be consistent and even-handed when compared with all post Jackson death penalty cases considered by this Court.[2]
The judgment of the lower court is affirmed and Wednesday, July 27, 1983, is set *673 as the date for execution of the sentence and infliction of the death penalty in the manner provided by law.
AFFIRMED.
WALKER, P.J., BROOM, P.J., and ROY NOBLE LEE, BOWLING, PRATHER, and ROBERTSON, JJ., concur.
HAWKINS and DAN M. LEE, JJ., dissent.

APPENDIX "A"
DEATH CASES AFFIRMED BY THIS COURT:

Leatherwood v. State, 435 So.2d 645 (Miss. 1983).

Hill v. State, 432 So.2d 427 (Miss. 1983).

Pruett v. State, 431 So.2d 1101 (No. 54,000, decided February 23, 1983).

Gilliard v. State, 428 So.2d 576 (Miss. 1983).

Evans v. State, 422 So.2d 737 (Miss. 1982).

King v. State, 421 So.2d 1009 (Miss. 1982).

Wheat v. State, 420 So.2d 229 (Miss. 1982).

Smith v. State, 419 So.2d 563 (Miss. 1982).

Edwards v. State, 413 So.2d 1007 (Miss. 1982).

Johnson v. State, 416 So.2d 383 (Miss. 1982).

Bullock v. State, 391 So.2d 601 (Miss. 1980).

Reddix v. State, 381 So.2d 999 (Miss. 1980).

Jones v. State, 381 So.2d 983 (Miss. 1980).

Culberson v. State, 379 So.2d 499 (Miss. 1979).

Gray v. State, 375 So.2d 994 (Miss. 1979).

Jordan v. State, 365 So.2d 1198 (Miss. 1978).

Voyles v. State, 362 So.2d 1236 (Miss. 1978).

Irving v. State, 361 So.2d 1360 (Miss. 1978).

Washington v. State, 361 So.2d 61 (Miss. 1978).

Bell v. State, 360 So.2d 1206 (Miss. 1978).
DEATH CASES REVERSED AS TO PUNISHMENT AND REMANDED FOR RESENTENCING TO LIFE IMPRISONMENT.

Edwards v. State, (No. 53,800, decided March 16, 1983).

Coleman v. State, 378 So.2d 640 (Miss. 1979).
HAWKINS, Justice, dissenting:
I respectfully dissent, and would remand this case to the circuit court for a mandatory sentence of life imprisonment.
In the sentencing phase of this trial, after the state rested, the following developed in chambers:
BY MR. MOORE [counsel for defense]:
Let the record show that, upon completion of the State's case, and a conference with David Tokman, that it has been decided not to place him on the witness stand for the reason that he would not assure his counsel or promise his counsel that he would not tell the jury that he would prefer the death penalty rather than serve time in Parchman. Is that correct, David?
BY THE DEFENDANT:
Yes, sir.
BY MR. MOORE:
Is there anything else you would like to add to that?
BY THE DEFENDANT:
No, sir.
BY MR. TAYLOR [counsel for defendant]:
We would also like for the record to reflect that Judge Moore and I have both conferred with David extensively in an effort to determine if there was anyone, including family members, that he knew of who would be able to give aid and assistance to him by testifying for him in the sentencing phase of this trial and we are of the conclusion that there are none. I would further like to state for the record that, prior to the beginning of the trial, David's mother was contacted in Dearborn, Michigan and asked to come to Jackson to testify for her son in the sentencing phase of this trial, if necessary. She declined on the grounds that she had *674 laryngitis and was going through a divorce.
(R. 567-68).
While not revealed in this record, the record in the companion case of Leatherwood v. State, 435 So.2d 645 (Miss. 1983), indicates that Tokman's military commanding officer at Fort Polk was aware Tokman had undergone psychiatric treatment. The nature or extent of this was never developed. (Leatherwood Record, pp. 669-70).
The absence of any evidence going to Tokman's rearing, training, or background is serious, in my view. Had the circuit judge, in the absence of a jury, been considering the penalty to be imposed in this case, it is inconceivable that he would not have required a pre-sentence investigation and report in which the entire background of Tokman would have been thoroughly explored. Indeed, Eddings v. Oklahoma, 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982), holds that the circuit judge may not ignore the background of an accused in a death penalty case.
From the record before us, we cannot know whether such non-disclosure was beneficial or harmful to Tokman. He was represented by able, intelligent counsel who may have had excellent reason for not offering any evidence on Tokman's background.
The record does reveal a mother whose absence of care or concern for her child was both unnatural and sickening. The Leatherwood record indicates some psychological problem in his background. Further, the record reveals the bravado Tokman showed before his associates coming apart at the seams in court chambers when his counsel informed the trial judge that the reason they did not put him on the witness stand was because of the danger of his telling the jury he preferred the death penalty. Thus did the hater finally recognize the prime object of his hatred: himself.
Eddings contains some apt comment on youth:
But youth is more than a chronological fact. It is a time and condition of life when a person may be most susceptible to influence and to psychological damage. Our history is replete with laws and judicial recognition that minors, especially in their earlier years, generally are less mature and responsible than adults. Particularly "during the formative years of childhood and adolescence, minors often lack the experience, perspective, and judgment" expected of adults.
Id. at 115-16, 102 S.Ct. at 876-877 (footnotes and citation omitted).
Tokman was seventeen when he committed this crime. Because of his age, and what the record does reveal about his background, I would remand this case to the circuit court with directions to impose a sentence of life imprisonment. This generally is consistent with the statements I made in Leatherwood, which will not be repeated here.
DAN M. LEE, J., joins this dissent.
NOTES
[1] I.e., two aggravating circumstances and one mitigating circumstance require the imposition of the death sentence or conversely one aggravating circumstance and two mitigating circumstances require a life sentence.
[2] See Appendix "A".