## GARRETT *v.* STATE.

(Division B. Feb. 5, 1940. Suggestion of Error Overruled Feb. 19, 1940.)

[193 So. 452. No. 33972.]

Adams & Long, of Tupelo, for appellants.

**W. D. Conn, Jr.,** Assistant Attorney-General, for the State.

Argued orally by **S. H. Long**, for appellant, and by **W. D. Conn, Jr.**, for the State.

**Ethridge, P. J.**, delivered the opinion of the court.

Sam Garrett, the appellant, was indicted in the Circuit Court of Lee County at the May Term of 1939 upon the charge that he wilfully, feloniously and unlawfully committed an assault upon W. P. Mitchell with a certain deadly weapon, to-wit, a pistol, with intent to kill and murder. The alleged assault with intent to murder was made upon W. P. Mitchell, County Prosecuting Attorney of Lee County, Mississippi, during the course of a search by the sheriff and deputies, just outside the limits of the City of Tupelo. The search warrant was procured by W. P. Mitchell, and it appears that there had been a previous search of the place a few days prior to the search here involved.

A motion was made by the defendant, through his attorneys, to have the circuit judge recuse himself on account of friendly relations existing between him and the witness for the prosecution (who was the victim of the assault)—a friendship of long standing which would likely influence the judge in a ruling on the evidence of the cause; that they had roomed in the same home; that in the past they had occupied adjoining offices; that W. P. Mitchell was campaign manager for the judge at the time of his election which would put him under obligation; and that the judge was largely instrumental in having the Governor appoint W. P. Mitchell as county attorney as he had circulated a petition among the Bar and urged the Bar of the county to endorse him; that this combination of circumstances would make the relationship between them so close that it would be impossible for any man, no matter how strong his character and purpose, not to be influenced against the defendant in his judgment of the case and in sentencing in case of conviction. On the hearing of this motion, it appeared

that: W. P. Mitchell had occupied a room in the home of the mother of the judge; that the friendship between them had existed for approximately two years; that they had occupied adjoining offices; that Mitchell had managed the campaign of the judge in his race for that office; and that the judge had used his influence to secure the appointment of Mitchell as county attorney.

The judge made a statement into the record in which he stated that:

"The filing of this motion places the presiding judge of this court in rather an embarrassing situation, for the reason that if the time ever comes when a case is presented for a trial or decision in the Circuit Court of this District when this Judge feels he is not qualified to try that case and preside over the trial, it will be absolutely unnecessary for Counsel or litigants to file a motion for me to recuse myself. Therefore this motion comes to me at this time in the attitude of having been passed on by me when I presided over the first motion filed in this case. If I had not felt at that time that I was qualified in every particular and that I could extend to this defendant all of the rights to which he is entitled under the law, I would have recused myself upon the presentation of the first motion for continuance in this cause.

"For the benefit of the record, it might be well for me to add that the close relation existing between me and the prosecuting witness in this case is very much appreciated by this Court, but that if I had any fear that that relation would cause me to deviate from my duty in this case in the least, I wouldn't have passed upon any matter in this case. It might be well to add that the relation between this Judge and Counsel for the defendant, especially one of those, Mr. Long, has likewise been very cordial and very intimate over a period of many years."

The judge also stated that he had known the defendant, Sam Garrett, longer than he had known the prosecuting witness, and that their relationship in the past had been

very cordial and friendly. He overruled the motion, and his action in refusing to recuse himself is assigned for error. Section 165 of the Mississippi Constitution of 1890 prescribes the cases wherein a judge shall not preside. It provides that "No judge of any court shall preside on the trial of any cause, where the parties or either of them, shall be connected with him by affinity or consanguinity, or where he may be interested in the same, except by the consent of the judge and of the parties." This section also provides, in the case of disqualification, how a judge shall be selected to preside.

In the case of McLendon v. State (Miss.), 191 So. 821, it was held that there was no affinity between blood relationships of husband and wife within the constitutional provision prohibiting a judge from presiding on a trial of any cause where the parties, or either of them, shall be connected with him by affinity or consanguinity; and the interest which disqualifies a judge must be a pecuniary or property interest, or one affecting his individual rights.

In Norwich Union Fire Ins. Co. v. Standard Drug Company, 121 Miss. 510, 83 So. 676, 11 A. L. R. 1321, it is likewise held that the judge was not disqualified although related to an attorney in the case who was employed on a contingent fee, but had no interest in the subject matter of the suit, and, that, unless the attorney had a pecuniary or personal interest, he was not disqualified; and, to the same effect is Ferguson v. Brown, 75 Miss. 214, 21 So. 603; and Cashin v. Murphy, 138 Miss. 853, 103 So. 787.

The Constitution specifies what constitutes disqualification, and a judge cannot be disqualified from presiding at any trial unless he is disqualified within such provisions. The Constitution also provides that there shall be a trial by a fair and impartial jury. Section 26. An impartial trial is one of the constitutional rights of every person accused of crime. In any case, a judge is not supposed to be partial, biased or prejudiced, and by virtue of his training and experience in dealing with trials,

matters of law and evidence, he can distinguish the niceties of the situation and accord to every party his full legal right. Should a case arise in which it was obvious that a judge had been partial, biased or prejudiced, and that his attitude and conduct had brought about an unfair trial, the Court would reverse the case and grant a new trial. A circuit judge has great responsibility, and much latitude is allowed him in the discharge of the high and important duties which his office imposes upon him. Necessarily, he may know a great deal about many of the cases that arise in his district, but it is not contemplated that he should be disqualified from presiding merely because he knows the facts of the case, or that he is more friendly with one of the litigants than with the other. Primarily, he is to judge his own qualification and fairness, and unless a record reffects an abuse of his powers to the extent of showing probable injustice, the Court here will not reverse a case upon such grounds.

It appears from the judge's statement that the motion for a continuance had been passed prior to the motion to disqualify him. While an attorney may rightfully, in cases where he thinks the judge's relations would result to the injury of the defendant, move for a recusation of the judge; this Court, in such a case, will look to the whole trial and pass upon questions on appeal in the light of the completed trial. Every act and movement had during the entire trial will be considered, and if we are unable to find that rulings have been prejudicial to the defendant, we will not reverse.

The defendant filed a motion for a continuance of the case on the ground that his wife and married daughter could not attend the trial and testify on account of illness; that they had been subpoenaed; and that his wife, if present, would testify that, for a week prior to the shooting on the night of March 11, 1939, she had observed that he was mentally unbalanced, that his conversation and actions indicated that state, that his condition continued to grow worse, and that on the morning of the

day before the shooting, he was, in her opinion, completely beside himself; in fact, so much so, that she had discussed it with several people. Also, that she would testify that on the morning before the shooting they had visited their daughter's home, and while there he had indulged in a lot of unreasonable talk which showed that his mind was affected and that he did not know right from wrong; and that, after staying at their daughter's house an hour, they went home in East Tupelo and he continued to talk and commit acts, too numerous to detail in the affidavit, which indicated to her that he was insane and that he did not at that time have the proper state of mind to distinguish right from wrong. It was also alleged in the motion that the daughter would likewise testify in substance to the same things. Certificates of a physician were furnished as to the illness of the wife and daughter, but the court appointed a physician to examine them who, after an examination of the absent witnesses and consulting with the physicians who attended them, testified that they might attend the trial, if proper facilities for their rest were provided at the courthouse, without seriously endangering their health or lives although it might increase their nervousness and discomfort. On the trial of the case, the son of the defendant testified substantially as the affidavits set forth. The wife and daughter were not produced, on a motion for a new trial, to show what their testimony would be; nor were affidavits obtained from them showing the court what their testimony would have been had they been present in court. This was required of the defendant in the cases of Lamar v. State, 63 Miss. 265.; Ivey v. State, 154 Miss. 60, 119 So. 507; Cox v. State, 138 Miss. 370, 103 So. 129; and Henderson v. State (Miss.), 192 So. 495, 497. As said in this last case: "This rule is reasonable, easily complied with, and promotes proper practice for securing justice, and avoiding delay in criminal and other trials. Every trial lawyer should familiarize himself with these requirements and comply with them in cases where these rules are applicable."

There was an abundance of testimony for the State showing that, at the time of the act of assault, the appellant was sane and normal. It was also shown that, after the assault was committed, the appellant went behind the counter in the place searched and procured a tablet which he took and within a very short period of time he fell out, apparently unconscious, and remained in that condition for some time. He testified that he had no recollection of shooting Mitchell; that he procured tablets from some traveling person who recommended them as being strong and efficient as a cure for headaches; that he had had a fracture of the skull a year or two before the shooting and frequently had violent headaches and had to have opiates or rest powders to relieve them; that, while in this condition, he did not know what he was doing; and that he had not known what he was doing during the day in which the shooting occurred in the evening. He produced testimony as to the fracture of the skull, but the physician who attended him at that time did not say in his testimony that his mind was affected or that resultant headaches would probably have been as violent as indicated by the defendant. In the early part of the night after the shooting had occurred, the appellant was carried to jail and transferred to the jail at Iuka, Mississippi, reaching there about 12:30, when he called for a physician. The physician attending him testified that he asked for morphine to relieve what he claimed was violent suffering, but that he complained of a leg upon which he had a sore which he dressed. The physician also testified that he did not find anything wrong with his mind at that time; and that he did not give him morphine but pretended to do so, and that had the appellant been an addict or user of morphine that he could not have deceived him. Also, there was testimony that during the period he was in jail at Iuka preceding the trial that he was normal mentally, that he did not obtain any morphine or similar drug and that he had had nothing administered stronger than aspirin. We are therefore

unable to reverse the case on the ground of refusing the continuance.

A motion was then made for a change of venue, in which it was set out that there had been great excitement and fixed opinions among the citizens of Lee County. Many witnesses were examined in connection with this motion, both for the State and for the defendant, and most of them testified that there had been many expressions of opinion hostile to the defendant shortly after the shooting; that a newspaper published in Tupelo (The Tupelo Journal) which has a large circulation in Lee County, Mississippi, had, in repeated issues, discussed the case, giving what the paper stated facts to be, drawing hostile conclusions against the defendant and calling for rigid law enforcement in the county; all of which were calculated to arouse a hostile public opinion toward the defendant. Most of the witnesses testified that opinions had been expressed by large numbers of people; that there were some favorable to the defendant but many hostile to him; and that, in their opinions, a majority of the electors of the county had formed an opinion or had prejudged the case. Most of these witnesses were examined along the lines that a venireman would be who had been called for jury service. They were asked their individual opinion as to the guilt or innocence of the defendant and if they could go into the jury box and disregard such opinion and give the defendant a fair trial. Some of the witnesses testified that a jury could be obtained in Lee County that would give the defendant a fair and impartial trial; also, that they had not heard much discussion of the case since the first few weeks after the shooting and that, in their opinions, the state of hostility or prejudgment had died out. A number of issues of the Tupelo Journal were introduced in evidence. Without undertaking to set out the substance of the various articles or editorials that were of a character calculated to prejudice the public against the appellant, they were calculated to prejudge the case against the de-

fendant. The articles and editorials appealed to the best element of the people to assert themselves; and for a selection of the best men of the county to try the defendant and others at that term of court. Many witnesses indicated that it appeared that approximately 60% of the people had prejudged the case to the extent that it would take strong testimony to remove their opinion, and some of the witnesses examined testified that while it might take evidence to displace the opinion they had, that it could be done, and that if they were selected that they could disregard any opinion they had formed and try defendant on the evidence, and thought that most of the jurors thought they could do so. However, some of them said that they could not disregard their opinion. It appeared from the evidence that approximately 66% of the families of the county subscribe to the Tupelo Journal. The newspaper has nearly four thousand subscribers in the county. It also appeared that accounts had appeared in other papers circulated in the county. At the conclusion of the evidence on the motion to change the venue, the judge overruled it. Over one hundred veniremen were examined for jury duty, and the jury who tried the case were empaneled from this number of jurors. Most of the jurors examined had read the papers and had discussed the case, and to some extent had formed an opinion, but said that they could try the defendant on the evidence, giving him a fair trial regardless of what they had read and heard. The jury were examined as usual in such cases, but many of the questions propounded to them were not shown to have been answered in the record. We presume from experience at the bar that the jurors either nodded or shook their heads in response to the questions, although it is not shown in the record. We also presume that the judge required them to answer, accepting a shake or a nod of the head as the case might be, but we cannot determine what the answers were. We think it proper here to refer to the practice, on the motion for a change of

venue, as to examining witnesses in reference thereto. The object is to ascertain whether the general public has formed an opinion or prejudged the case. The witnesses should not have been required to give their personal opinions as to guilt or innocence, but should have been limited to questions and answers pertaining to the condition of the public mind as to whether it had prejudged the case. Neither should they have been asked the personal opinions of their neighbors, associates, or people with whom they had discussed the matter as to guilt, as this placed them in an embarrassing position and did not control the disposition of the motion. The case may have been prejudged, although there might have been equal numbers of people who thought the defendant innocent as thought he was guilty. If a man has formed a decided opinion that would not readily yield to the evidence, he would not be competent as a venireman; and if the sentiment of the county had been such as to prejudge the merits of the case, the motion should have been sustained to change the venue. Many men may think themselves competent to discard formed opinions and accept the evidence as delivered from the witness stand, but their opinion as to this alone should not be controlling. If there is such a decided prejudgment of the case that it is not likely that a jury drawn in a regular way would result in a fair and impartial trial, the case would have been prejudged in a legal sense. If the prejudgment extended to such generality as a majority of the jurors, a juror might be embarrassed by having to encounter this public opinion contrary to his own, although he might think that he could respond to the requirements of the law regardless of his neighbors opinion. The policy of the law is that the juror should be free to accept or reject evidence without having to run counter to a decided public opinion. Of ourse, there are jurors who could set aside formed opinions, but the ordinary mind is not so constituted as to readily and freely discard opinions when formed. The object of the law is

to procure a fair and impartial jury in order to have a fair and impartial trial.

A fair trial is well defined in Fisher v. State, 145 Miss. 116, 110 So. 361, 365, where it is said: "Perhaps no precise definition can be given it, but it certainly must be one where the accused's legal rights are safeguarded and respected. There must not only be a fair and impartial jury and a learned and upright judge to instruct the jury and pass upon the legal questions, but there ought to be an atmosphere of calm, in which the witnesses can deliver their testimony without fear and intimidation, and in which the attorneys can assert the defendant's rights freely and fully, and in which the truth may be received and given credence without fear of violence." It was also said in the same case; "In passing upon an application for a change of venue the court looks to a completed trial, and if at any stage of the trial it appears that the case has been so prejudged, or that other conditions exist which prevent a defendant from securing a fair and impartial trial, the court should entertain the motion even though this appear upon a motion for a new trial. . . ."

Inasmuch as the record does not disclose who served on the jury and the answers to questions of the judge, we must assume that a proper jury was selected. Neither the court nor counsel should accept a nod or a shake of the head in lieu of an answer to a question. In such cases, this Court cannot reverse the decision of the judge but must accept it, on the theory that he saw things not recorded in the record.

On the trial of the case on its merits, the State introduced through the prosecuting witness, conversations had with the defendant with reference to the search and to a prior case in the chancery court asking to enjoin the continued sale of intoxicating liquors, and an offer by the defendant to him, as county attorney, of a bribe to withdraw the suit in equity so that he might complete a sale of his place of business which he had under consid-

eration at the time of the alleged conversation. Also, conversations in which the defendant stated to him, as county attorney, that he thought he was going too far; that he was picking on him, that other officers had not been so hard; and that if he would be easier in the matter it might be better for him in the approaching election. These conversations with reference to other cases were introduced for the purpose of showing the motive of the shooting on the part of the defendant. There was no reversible error in admitting the evidence. We also think that the evidence for the State is overwhelming. It is difficult to see how a fair and impartial jury could have rendered any other verdict than that of guilt.

The appellant also assigns as error, the argument of the district attorney made in his address to the court and jury. The first objection was to the district attorney's argument in another case tried at the same term of court, in which it was claimed that the district attorney said to the jury: ''You are here for serious business: other matters are coming up for your consideration during the week,'' and at the end of the argument said: ''I do not think this jury should turn this man loose and if you turn this man loose, I don't think I should be called on to prosecute any man for shooting or stabbing a man in the guts in Lee County.'' A motion was made by attorneys of Sam Garrett to dismiss the panel because of these remarks and to continue the case, which motion was overruled. An attorney for the appellant referred in his argument to the fact that there was an outside demand for the conviction of his client, which argument we assume was built upon the fact that veniremen on examination testified to reading newspaper articles which had urged vigorous prosecution, public opinion in the county, and to their own opinions.

In the district attorney's concluding argument (which is copied in the record) he said, among other things: ''My friend says he understands, it is his information, that there has been outside pressure brought to on the

jurors in this case. I want to say to you, gentlemen of the jury, the greatest thing that is to be feared here tonight is the inside pressure that I understand has been brought to bear, and I am like my friend, I give it to you straight from the shoulder, I understand there has been some inside pressure attempted to be brought to bear on the jurors in this case. I want to say to you gentlemen of the jury, as citizens of Lee County you ought to resent it, outside pressure or inside pressure, and that's the reason that I asked every man on this jury when he came up for qualification if he had been approached with reference to a decision in this case. . . . I want to tell you the time has come when such stuff ought to be stamped out of existence. Taxpayers, every one of you, breaking your backs day in and day out to pay the taxes to run expensive courts wherein it takes days and days to try a man, as my friend Adams says, for the commission of one of the most dastardly crimes in Lee County. Taxation, and just so long as it is possible for outside or inside pressure to be used on a juror in Lee County you are going on under the yoke of taxation and criminalization." The district attorney continued, but the full argument cannot be set out. In the course of his argument, he said: "I know some men on this jury that thank their God tonight that in some case in which they were vitally interested in Lee County my good friend and distinguished friend, Marshall T. Adams, was District Attorney, and fought the fight of his life. What do you want us to do? Quit? That would leave Lee County in a nice situation." He referred and commented on the bloody clothes and pistol which were introduced as exhibits to the evidence, and to the testimony of physicians. He then said: "I want to tell you, gentlemen of the jury, I would have stopped this argument several minutes ago if hadn't been for the fact that my good friend Marshall brought to light there had been pressure brought to bear on this jury, outside pressure he understood. I got it the other way. I under-

stood it was inside influence. I want to say to you if there is a man who thinks he can hang this jury and get $100.00 out of somebody for doing it, he's bad wrong, for the State or for the defendant, and I want to say if there had been any hundred-dollar influences used on any man on this jury, you might as well make up your mind now to forget it." An objection was interposed and a motion for a mistrial was made at this point. The motion was overruled, and the counsel continued: "I have two minutes to tell you that this is in my opinion one of the most vital cases you have ever had in a courtroom, and I want to say to you that I believe the eyes had in a courtroom, and I want to say to you that I believe the eyes of Mississippi are on you tonight, everyone of you, and I, too further say this: With all due respect to every-thing that's been said, I don't believe there is a man on this jury, not a one, that hasn't the highest regard for his oath."

This argument injected statements of fact and conclusions which were not in evidence, and violates a rule of advocacy. Counsel have very wide latitude in their arguments, and the court will not unduly restrain them in exercising their own conception of the course of the argument so long as the comment is upon facts in evidence. This matter of the great freedom allowed counsel is discussed in the case of Nelms & Blum Company v. Fink, 159 Miss. 372, 131 So. 817, and it is stated in that opinion and in many others, at least as far back as Perkins v. Guy, 55 Miss. 153, 30 Am. Rep. 510, that counsel should not state facts that are not in evidence. The jury must try the case on the law and the evidence, and within the limits of the evidence, counsel has the greatest of freedom commensurate with the conduct of a fair trial. We cannot approve the type of argument indicated in the quotations in this case, and were it not for the fact that the guilt is established beyond every reasonable doubt, we should unhesitatingly reverse the case; but, where reasonable, intelligent and honest men could not find a

verdict contrary to that which was found, we cannot reverse the case simply to have done again that which the evidence clearly indicates has been done. Whenever sentiment is influenced against a defendant and conviction is highly probable, counsel for the State should avoid resorting to extreme argument. There are cases which call for strongest reasoning and where invective may be justified and tolerated, but counsel should never make statements that are not supported by evidence. It is true, in the case here, that there was evidence that the appellant tried to bribe the county attorney, but there is no testimony showing that there was an attempt to bribe any member of the jury. It is said by the assistant attorney general that the argument was invited by counsel for the appellant by his reference to "outside influence," but we think the examination of the jury, and their statements as to having read the papers and having formed an opinion, furnished a basis for the defendant's attorney's argument. At all events, counsel should be careful not to state matters of fact where there is no evidence to justify them; and, it is only because a fair jury could not, in our opinion, reach any other conclusion than guilt that we affirm this case.

Affirmed.