IN THE SUPREME COURT OF MISSISSIPPI
NO. 93-KA-00489-SCT

*FREDDIE YOUNG*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 01/07/93 |
| TRIAL JUDGE: | HON. ROBERT LEWIS GIBBS |
| COURT FROM WHICH APPEALED: | YAZOO COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | GUY N. ROGERS JR. |
| ATTORNEYS FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY:  W. GLENN WATTS |
| DISTRICT ATTORNEY: | PETERS, EDWARD J., |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 8/1/96 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | 8/22/96 |

**BEFORE PRATHER, P.J., ROBERTS AND MILLS, JJ.**

**MILLS, JUSTICE, FOR THE COURT:**

¶1. Freddie Young was convicted of capital rape before a jury empaneled in the Circuit Court of Yazoo County. From a sentence of life in prison, Young appeals his conviction to this Court.

## FACTS

¶2. In April of 1992, a six-year-old female child went to school. During that week she complained to school officials of her vaginal area burning when she went to the bathroom. On or about April 8, 1992, the school reported suspected child abuse to the Yazoo County Department of Human Services. On April 9, 1992, June Harris Smith (Smith), a social worker, responded. During their first meeting, the child told Smith that she had fallen on a stick. On April 10, 1992, Smith went to the child's home and spoke to her caretaker, Contra Pleasant, an aunt. Contra Pleasant told Smith that the incident with the stick had occurred several months earlier. Pleasant related that she had bathed Young and her little brother with laundry powder, which had chapped both of them. Smith asked the aunt to take the child to see Dr. Gambrell at the King's Daughters Hospital.

¶3. Friday night, Smith received a call from the staff at the hospital informing her that they suspected

child abuse. A registered nurse on duty in the emergency room related that the child had an abnormally large vaginal opening, twice the size of that of a normal six-year-old child. The child stated her name, that she had an uncle named Maine and, that she lived with her aunt. The nurse's notes from this visit state, in pertinent part, "Pt. will only tell me her name and that she has an uncle named 'Mane,' but refused to name any other male family that visits home." Dr. Larry Cooper testified that in his expert opinion a smooth object had penetrated the child's vagina. He testified that the six-year-old child did not speak to him at all, but the child mentioned Uncle Maine's name. (Uncle Maine is another male relative living in the child's household, other than the defendant.) Dr. Cooper listed this fact in his notes.

¶4. In response to the call from the hospital staff, Smith met the child in the emergency room. She sat and talked to the child for about an hour. The child related that on a school night the previous week she had been in her bed. The child shared a room with another young person. The child stated that four relatives, including Uncle Maine, were in another room watching television. According to direct testimony of Smith, her question of the child related the following:

Q: Did she tell you what happened?

A: And then I asked her who. I said, "Who came in; who did this?" And she, as children will a lot of the time do, didn't really want to come right out with it, but she did say Fred. And I asked her who was Fred. And she said, "That's my uncle." And I asked her what did -- then I used Fred as a reference point from there on. "What did Fred do?"

Q: Did she tell you what he did once you asked her that?

A: She did. She told me that she was in the bed asleep, and that he came and got in the bed with her, and that she was on her back. She said that he got on top of her. And I said, you know, "Did you say anything?" She said, "I told him to stop, but he didn't." And she said he kept his clothes on. She said she had on a gown, a night shirt. He pulled her panties off or down and pulled his clothes down, not necessarily off. I don't remember exactly, but left his upper clothing on. He got on top of her.

¶5. By using a drawing, Smith related that the child, when asked 'what part of his body?', pointed to a space between the legs of a gender neutral figure. Smith then drew in the figure of a penis and asked the child to describe how it felt. The child said, "It was hard, and it pushed, and it hurt." Smith testified that the document was the most important document she possessed in her file regarding this case.

¶6. When Contra Pleasant returned home, she accused FreddieYoung, the appellant, of raping the child. Young replied, "I never touched her."

¶7. The next morning Smith went to the home of the child with John Abel, an officer with the Yazoo City Police Department. Smith asked the child, "Now . . . are you sure this is what happened to you, and are you sure this is who did it?" The child replied affirmatively. Officer Abel corroborated that the child said her Uncle Fred did this act. Young was arrested later that day.

¶8. Elizabeth Milner (Milner), a child sexual abuse counselor, also interviewed the child. The State

qualified Milner as an expert in child abuse. Milner testified that in an hour-long interview, the child played with four anatomically correct dolls, representing a man, a woman, a boy and a girl. The little girl was frightened and did not tell a story of what happened. However, she demonstrated the experience with the dolls. Without being asked which dolls to use, the young girl demonstrated vaginal penetration using the man doll on top of the girl doll. Milner did not ask the girl who the perpetrator was, nor did the child volunteer that information.

¶9. At trial the little girl testified. Apparently she was quite scared, and refused to answer who the perpetrator was during repeated questions lasting for ten pages in the transcript. In response to the question "Who did you tell [Smith] at the hospital that hurt you?" the young girl finally answered, "Fred." On cross-examination the child stated that she had never seen the anatomical figure drawing.

## I.

### DID THE TRIAL COURT ERR IN DENYING THE DEFENDANT'S MOTION FOR A MISTRIAL, OR IN THE ALTERNATIVE, AN ADEQUATE CONTINUANCE FOR A DISCOVERY VIOLATION?

¶10. During the State's case-in-chief, Smith testified regarding her investigation of sexual abuse concerning this child. During her testimony, the defense objected that Smith was reading from a document. The defense requested to know the nature of the document. Smith testified that she was using an anatomical drawing she kept in her notes. Smith had made these notes during her emergency room visit with the child.

¶11. The defense objected that the anatomical drawing had been withheld from a discovery request. The State replied that Smith had provided the drawing only immediately prior to the witness taking the stand. The trial court excused the jury. The trial court then conducted a hearing on the discovery violation. The trial court determined that as the State was planning to solicit testimony from Smith regarding this diagram, a discovery violation had occurred. Further, the trial court found the diagram surprised the defendant. The trial court found no intentional violation by the State. The trial court granted the defense a two-day continuance pursuant to Rule 4.06 of the Uniform Criminal Rules of Circuit and County Court Practice.

¶12. When trial reconvened two days later, defense counsel renewed its request for a mistrial, or in the alternative, a longer continuance, stating it had not had an opportunity to prepare. Defense counsel stated on the record that three experts, physicians, had been contacted, each of whom would testify that the anatomical drawing was highly suggestive to the child. Defense counsel stated that he had personally contacted each of these physicians. Defense counsel gave the trial court the telephone numbers of each physician contacted. Defense counsel stated that one physician could testify the next day and requested the continuance extend to that time. The trial court denied both motions.

¶13. On appeal, Young contends that the lower court did not grant him an adequate continuance reasonably necessary to investigate the credibility of the evidence and prepare an adequate response to it, citing **Box v. State**, 437 So. 2d 19, 23 (Miss. 1983) (Robertson, J. specially concurring).

¶14. Rule 4.06 provides, in part, that:

[I]f, after such opportunity, the defense claims unfair surprise or undue prejudice and seeks a continuance or mistrial, the court should, in the interest of justice and absent unusual circumstances, exclude the evidence or grant a continuance for a period of time reasonably necessary for the defense to meet the non-disclosed evidence or grant a mistrial.

Unif. Crim. R. Cir. Ct. Prac. 4.06(I)(2).

¶15. The State urges this Court to find that there was nothing suggestive in the method of using the drawing and therefore, the use of the drawing did not prejudice the defendant. The central question on appeal is whether the trial court's denial of one additional day of continuance was an abuse of discretion where the defendant sought expert testimony to attack the investigative procedures of a social worker.

> In *West v. State*, this Court reviewed a discovery violation where the lower court failed to grant a sufficient delay for defense counsel to prepare for surprise expert testimony. In that case, the prosecution informed the defendant that Dr. Rodrigo Galvez, a board certified pathologist and psychiatrist, would be testifying as an expert in the field of pathology. When Dr. Galvez was examined at trial, however, the district attorney elicited testimony regarding Galvez's expertise in psychiatry. As fate would have it, this testimony, addressing the psychosexual disorder of necrophilia, became a crucial element in the State's theory of the case. When faced with defense objection, the lower court allowed Dr. Galvez to testify, but granted defense counsel, in essence, a one day continuance to prepare for the cross-examination. This Court found that this delay was insufficient. We stated:

> Precisely because the prosecution's necrophilia theory was so central to the question whether West could be exposed to the death penalty, a day's break in the action was an inadequate antidote for the prosecution's discovery violation. This is the sort of prosecution theory which, had the defense known of it prior to trial, may well have altered the entire defense strategy. It is the sort of theory which would no doubt have sent the experts scurrying to the books for study and reflection. With all else that must of necessity be juggled in the course of a capital murder trial, unreality attends any suggestion that defense counsel can stop in midstream and become sufficiently informed on a subject like necrophilia to cross-examine with competence.

*Jenkins v. State*, 607 So.2d 1171, 1178 (Miss. 1992) *quoting* *West v. State*, 553 So.2d 8 (Miss.1989)

¶16. However, this Court has also stated, "By no means does this mean invariably that the defendant will be entitled to a continuance until the next term of court. There will no doubt be cases where postponement of a day or two, or in some cases even an hour or two, will suffice." *Stewart v. State*, 512 So. 2d 889, 892-93 (Miss.1987).

¶17. In the instant case, the trial court granted a reasonable continuance to the defendant to prepare his response to the drawing. His ability to cross-examine the witness regarding the drawing was unlimited. He had two days to prepare for his cross-examination. Finally, the evidence itself was cumulative and the facts established by the document were corroborated by other independent evidence. This Court does not find that the trial court abused its discretion in failing to grant an additional day.

**II.**

### DID THE TRIAL COURT ERR IN ADMITTING AN ANATOMICAL DRAWING MADE BY JUNE HARRIS SMITH AS THE DRAWING WAS HEARSAY?

¶18. Immediately before the trial reconvened and, while the parties were still discussing the discovery violation, the following colloquy occurred:

BY THE COURT:

Counsel, I'm still at a loss of what these doctors are going to say other than that the picture is highly suggestive. What does that have to do with your defense in this case?

BY MR. GUY ROGERS, JR.:

If the drawing is highly suggestive and it was not the victim's testimony, that it was elicited through suggestive techniques, then my defense would be that the little girl -- that that statement should not come in because it would be highly prejudicial. It's rank hearsay, and it does not bear sufficient indignantive [sic] reliability and guarantees or trustworthiness to come into evidence.

BY THE COURT:

It can come in under 803.25, and the indignantive [sic] or trustworthiness does not fall [sic] for the tender years exception. That's a totally new exception to the hearsay rule under the Mississippi Rules of Evidence.

BY MR. GUY ROGERS, JR.:

Your Honor, you may be right, but I do believe that even under 803.25 there are certain fact findings that should be made regarding the reliability, even though it is a tender years exception. I may be wrong, but I still think that that finding would have to be made before that document could be admissible.

BY THE COURT:

Your objection is noted. The motion is denied. I want the record to clearly reflect that the Court did grant a continuance. The Court feels that the continuance that it granted was reasonable, and the Court feels that the argument that you made today as to why you need an additional continuance is not meritorious, and therefore the motion for mistrial as well as for an additional continuance will be denied.

¶19. Immediately after the trial reconvened, the State sought to admit the drawing into evidence. Young again objected to the drawing's introduction as "hearsay and highly suggestive." The trial court overruled the objection. On appeal, Young argues the statement is hearsay and the method in which Smith made the drawing is suggestive. Young, in essence, argues that his inability to cast doubt on this procedure renders his trial fundamentally unfair when the document itself was entered into evidence.

¶20. As to the first question of whether this was hearsay, Rule 803(25) states:

> A statement made by a child of tender years describing any act of sexual contact performed with or on the child by another is admissible in evidence if: (a) the court finds, in a hearing conducted outside the presence of the jury, that the time, content, and circumstances of the statement provide substantial indicia of reliability; and (b) the child either (1) testifies at the proceedings; or (2) is unavailable as a witness: provided, that when the child is unavailable as a witness, such statement may be admitted only if there is corroborative evidence of the act.

M.R.E. 803(25).

¶21. The Comment to Rule 803(25) states:

> Some factors that the court should examine to determine if there is sufficient indicia of reliability are (1) whether there is an apparent motive on declarant's part to lie; (2) the general character of the declarant; (3) whether more than one person heard the statements; (4) whether the statements were made spontaneously; (5) the timing of the declarations; (6) the relationship between the declarant and the witness; (7) the possibility of the declarant's faulty recollection is remote; (8) certainty that the statements were made; (9) the credibility of the person testifying about the statements; (10) the age or maturity of the declarant; (11) whether suggestive techniques were used in eliciting the statement; and (12) whether the declarant's age, knowledge, and experience make it unlikely that the declarant fabricated. Corroborating evidence may not be used as an indicia of reliability. *Idaho v. Wright*, 497 U.S. 805 (1990). A finding that there is a substantial indicia of reliability should be made on the record. . . .

M.R.E. 803(25) Comment.

¶22. This rule allows statements of "causation and fault [and] has been expanded to include the identity of the perpetrator in child abuse cases." *Jones v. State*, 606 So. 2d 1051, 1056 (Miss. 1992).

¶23. The record is void of any hearing concerning the hearsay nature of this document. Furthermore, the trial judge stated that no requirement of indicia of reliability or guarantees of trustworthiness was necessary for evidentiary purposes. The record is also void of any evidentiary predicate being laid to admit this document under any other hearsay objection. The State did not seek its introduction under any other hearsay exception.

¶24. Without any hearing or findings regarding the trustworthiness of this statement, this statement was used as substantive evidence to prove Freddie Young was the perpetrator of this crime. This Court can find no alternative to holding that the trial court erred in admitting the drawing into evidence. However, in this case, the error was harmless.

¶25. Young did not object to the oral testimony of Smith, who stated that the child identified Young. Young did object to the statement of Officer Abel that he heard the child identify Young as the perpetrator. Nevertheless, on appeal Young does not complain of this hearsay statement. Finally, the young girl herself identified Freddie Young as the perpetrator on the stand. Where corroborative evidence exists and the hearsay evidence is merely cumulative, the admission may be held to be harmless. *Jones v. State*, 606 So. 2d 1051, 1057 (Miss. 1992). In the present case, the evidence the

jury could obtain from the anatomical drawing was repetitious of the oral testimony of Smith, to which Young did not object. Therefore, the error was harmless.

## III.

### DID THE TRIAL COURT ERR WHEN THREATENING DEFENSE COUNSEL WITH CONTEMPT FOR MAKING A TIMELY VALID OBJECTION IN THE PRESENCE OF THE JURY?

¶26. When the young child took the stand, she testified that she knew who Freddie Young was and identified him. The prosecutor asked the child where she was hurt, and she pointed between her legs (via a series of leading questions). The State began asking the child who hurt her there. The child did not answer. The child appeared, from the record, to be frightened and/or emotionally upset. The prosecutor continued to ask this question in various forms, leading and non-leading. The following exchange occurred:

> Q: I bet everybody always want [sic] to play with a microphone, don't they? So now you have a chance to say whatever you want to say into that microphone. So you just need to go ahead and tell us who came in your room and woke you up that night. Just tell that ole microphone who it was?
>
> BY MR. GUY ROGERS, JR:
>
> Your honor, I'm sorry, but I object to this. I don't mean to be mean, but I've got my client to protect.
>
> BY THE COURT:
>
> You can sit down. Sit down.
>
> BY MR. GUY ROGERS, JR:
>
> I object --
>
> BY THE COURT:
>
> I'm going to hold you in contempt, Mr. Rogers. Sit down.

¶27. The only other prior objection during the young child's testimony was to the prosecutor's demonstrative use of anatomically correct dolls. After the exchange noted above, the questioning continued. The young girl, some time later, testified that she had told Smith that Fred had done this to her. Defense counsel made no other objections.

¶28. On appeal, Young asserts that since the admonition took place in front of the jury, it bolstered the witness's testimony in the eyes of the jury and created unfair prejudice to the defendant, because the jury would infer that defense counsel had acted improperly.

¶29. We find no cases in this jurisdiction where this Court has reviewed a trial court's admonition to cease objecting upon pain of contempt.

¶30. In commenting upon the influence a trial judge has on the jury during trial, this Court has previously said:

> It is a matter of common knowledge that jurors, as well as officers in attendance upon court, are very susceptible to the influence of the judge. The sheriff and his deputies, as a rule, are anxious to do his bidding; and jurors watch closely his conduct, and give attention to his language, that they may, if possible, ascertain his leaning to one side or the other, which, if known, often largely influences their verdict. He cannot be too careful and guarded in language and conduct in the presence of the jury, to avoid prejudice to either party.

*Green v. State*, 97 Miss. 834, 838 53 So. 415, 416 (1910).

¶31. *Green* involved a judge who ran short of venire members and ordered a deputy sheriff to summon five talesmen, i.e., people summoned to serve as jurors from among by-standers at court. The stated purpose was, as the trial judge put it, "We want to break this nigger's neck." *Id.* at 835. The judge stated he made this statement in jest. *Id.* We reversed and remanded the conviction. *Id.* at 838.

¶32. We have also stated, "Should a case arise in which it is obvious that a judge had been partial, biased or prejudiced, and that his attitude and conduct had brought about an unfair trial, the Court would reverse the case and grant a new trial." *Garrett v. State*, 187 Miss. 441, 455, 193 So. 452, 455 (1940). *Garrett* dealt with a defendant's motion for recusal of a judge who was a friend of a prosecution witness. *Garrett*, 187 Miss. at 452-53.

¶33. In *Parker v. State*, this Court held that, "Ordinarily counsel may not complain of slight or not seriously prejudicial impropriety in remarks or comments by the court where they are provoked by himself." *Parker v. State*, 401 So.2d 1282, 1285 (Miss.1981).

¶34. In the present case, defense counsel did not appear to be bringing the opprobrium on themselves by questioning the trial court's ruling on any subject. Defense counsel was making an objection, the basis of which is unknown. It is apparent from the record that the trial court overreacted when he told defense counsel to sit down upon pain of contempt. However, these comments did not deny the defendant a fundamentally fair trial. *Garrett v. State*, 187 Miss. 441, 455, 193 So. 452, 455 (1940). Therefore, the error was harmless.

IV.

### WAS THE VERDICT AGAINST THE OVERWHELMING WEIGHT OF THE EVIDENCE?

¶35. On appeal, Young raises no question as to the sufficiency of the evidence, but questions the weight of it. Young points out that the statements of a six-year-old child, or repetitions of the child's statement, constituted the only evidence that he was the perpetrator. The State gained these statements, Young claims, through suggestive techniques against which he had an inadequate time to prepare. Young points out that before the interview with Smith, the name consistently mentioned was Uncle Maine. In later interviews with Milner, a child sexual abuse counselor, the young girl gave no

name. Finally, Young points to the jury's difficulty with this case. The jury asked three questions of the judge,[1] which went unanswered because all the evidence was in. The jury then deadlocked, only to be broken after the lower court read a proper *Sharplin* charge.

¶36. These cases are always the most troublesome because of the inflammatory nature of the crime and the poor quality of evidence typically presented. This case is no different. Under the facts presented to the jury, this Court cannot find that the verdict was against the overwhelming weight of the evidence. For these reasons, we affirm.

¶37. **CONVICTION OF CAPITAL RAPE AND SENTENCE TO LIFE AFFIRMED.**

**PRATHER, P.J., PITTMAN, ROBERTS AND SMITH, JJ., CONCUR. SULLIVAN, P.J., DISSENTS WITH A SEPARATE WRITTEN OPINION JOINED BY LEE, C.J., BANKS AND McRAE, JJ.**

**SULLIVAN, PRESIDING JUSTICE, DISSENTING:**

¶38. I respectfully disagree with the results reached by the majority in this case. On assignment number one, the trial court did abuse its discretion when it only granted a two-day continuance to allow defense counsel to prepare for surprise evidence used by the State in violation of discovery. This is particularly true when defense counsel told the court that he had an expert witness prepared to testify that the anatomical drawing was highly suggestive and that this witness could testify the next day. It was an abuse of discretion for the trial court not to continue the trial until the expert witness was available. Twenty-four hours would have made little difference.

¶39. The majority concludes that the continuance was reasonable to allow the defendant to prepare a response, but it certainly did not allow the defendant to produce a **witness** in response, which was the purpose for the *Box* request in the first place.

¶40. As to assignment number three, in and of itself and taken in a vacuum, it is easy to agree that while the trial judge's reaction was highly inappropriate it was not prejudicial; however, when viewed in light of the judge's abuse of discretion with the discovery violation and in view of the fact that the jury was hopelessly deadlocked and asked three questions of the trial court and only brought in a verdict after being given a *Sharplin* charge, I find assignment number three to be meritorious.

¶41. Under the totality of the circumstances of this case the trial judge abused his discretion on two occasions and as a result deprived the defendant of having a fair trial. I would reverse and remand for new trial.

**LEE, C.J., BANKS AND McRAE, JJ., JOIN THIS OPINION.**

1. The questions were: 1) Were there lights in the room when the alleged took place?; 2) How large is the house?; and 3) How far is the bedroom from the room where everybody was watching T.V.?